**UNITED STATES v. GARDNER.**

**Nos. 9637–9639.**

United States Court of Appeals
Seventh Circuit.

Dec. 20, 1948.

Virgil Norris, Albert Ward, and Palmer K. Ward, all of Indianapolis, Ind., for appellant.

B. Howard Caughran, U. S. Atty., and Elba L. Branigin, Jr., and Maurice W. Graston, Asst. U. S. Attys., all of Indianapolis, Ind., for appellee.

Before MAJOR, Chief Judge, and KERNER and MINTON, Circuit Judges.

MAJOR, Chief Judge.

Appellant Lewis Marvin Gardner (hereinafter referred to as the defendant or Gardner) was tried by a jury on three separate indictments which by agreement were consolidated for trial. He was found guilty on each of said indictments upon which the judgments appealed from were entered.

In appeal No. 9637, it was charged that the defendant "caused to be transported a stolen motor vehicle, [describing the same] from Indianapolis, in the Indianapolis Division of the Southern District of Indiana, to Nashville, State of Tennessee, and he then knew the said motor vehicle to have been stolen." This indictment was predicated upon the National Motor Vehicle Theft Act, 18 U.S.C.A. § 408 [now §§ 2311–2313]. In appeal No. 9638, it was charged that the defendant, together with Raymond F. Ivory and Richard M. Shelton "caused certain forged and counterfeited cashier's

checks [describing the same] to be transported from Richmond, in the Indianapolis Division of the Southern District of Indiana, to Chicago, State of Illinois, in interstate commerce, by transferring said forged and counterfeited checks to H. W. Chenoweth in exchange for automobiles, with the fraudulent intent to obtain title to said automobiles, knowing that said forged and counterfeited checks had been falsely made, forged, and counterfeited." This indictment was predicated upon the National Stolen Property Act, 18 U.S.C.A. § 415 [now § 2314]. In appeal No.9639, the defendant and the same co-defendants named in No. 9638, were charged with conspiring "to violate the National Stolen Property Act and the National Motor Vehicle Theft Act" in that they "did conspire to transport or cause to be transported in interstate commerce, falsely made, forged, and counterfeited checks, knowing the same to have been falsely made, forged, and counterfeited, and to obtain by a transfer of such checks a number of motor vehicles, which motor vehicles were to be transported in interstate commerce." The record does not disclose the disposition made of the cases against the co-defendants named in Nos. 9638 and 9639. It is sufficient to keep in mind that they were not tried with the instant defendant and we are not now concerned with the charges against them.

The judgments appealed from are attacked upon numerous grounds, the most important perhaps being that the proof was not sufficient to justify a submission of the charges to the jury. This question was properly preserved for review by a motion for a directed verdict as to each of the charges at the close of the government's evidence and again at the close of all the evidence. The court in each of the cases reserved its decision on the motions for acquittal, which were overruled subsequent to the jury verdicts.

As to No. 9637, it is argued that the proof does not show the transportation alleged was a stolen motor vehicle as that term is used in the National Motor Vehicle Theft Act, and that in any event there is no proof that the defendant had knowledge that it was stolen. As to No. 9638, it is argued that there is no proof that the defendant had any connection with the forged checks mentioned in the indictment, either in their execution or in their passing to Chenoweth, and in any event there is no proof that the defendant transported or caused to be transported such checks in interstate commerce. As to No. 9639, it is argued there is a complete failure of proof that the defendant entered into the conspiracy charged with knowledge that crimes were to be committed, as alleged in Nos. 9637 and 9638. It is further argued that the conspiracy indictment is defective because of a failure to allege that the conspiracy, insofar as it relates to motor vehicles, was entered into with knowledge that such vehicles were stolen or to be stolen.

The proof offered by the government to sustain the three convictions is in its essential aspects the same. The alleged stolen motor vehicle which the defendant is charged in No. 9637 with having transported in interstate commerce was obtained on October 7, 1947 from H. W. Chenoweth, an automobile dealer of Richmond, Indiana, and the forged checks and vouchers which the defendant is charged in No. 9638 with having caused to be transported in interstate commerce were given to Chenoweth in payment for said motor vehicle, and the proof as to these two substantive charges is relied upon to show the conspiracy charged in No. 9639. No authority need be cited for the proposition that knowledge is the scienter of the offense as alleged in each of the substantive charges, and we think that is likewise true of the conspiracy charge wherein the conspiracy alleged was to violate provisions of the statute which require the proof of such scienter. In other words, there could be no unlawful conspiracy to transport a stolen motor vehicle without knowledge that it was stolen and no unlawful conspiracy to cause to be transported a forged check without knowledge that it was forged.

Inasmuch as we have reached the conclusion that these judgments must be reversed for a failure of proof, it appears proper to relate in some detail the testimony upon which the government relies. In our view, the turning point in these cases is largely dependent upon what, if any, connection

or knowledge the defendant had as to the manner and means employed by Shelton and Ivory in obtaining the Buick car from Chenoweth. We shall, therefore, first consider the proof of defendant's activities prior to that event and, later, the proof subsequent thereto.

Defendant was engaged in the operation of a restaurant in Indianapolis, Indiana, and also was a dealer in second-hand cars. For the latter activity he had no place of business but was known as a curb dealer. On October 7, 1947, Shelton and Ivory visited the defendant's restaurant. Defendant was acquainted with Ivory but that was the first time he had met Shelton. Prior to going to defendant's restaurant, Shelton and Ivory had prepared and signed the forged checks which were later given to Chenoweth in payment for a Buick car. Defendant in his own car drove Shelton and Ivory to Richmond, Indiana, where Ivory intended to buy a car. Defendant parked his car a block or two from Chenoweth's place of business and, according to the testimony of Shelton, went downtown. Shelton and Ivory proceeded to the Chenoweth agency, first met a salesman and then later Chenoweth himself. They introduced themselves as Deming and Shelton and stated that they were from Joplin, Missouri. They succeeded in purchasing from Chenoweth a 1947 Buick Roadmaster Sedan and paid for the same by two forged and spurious checks. In connection with the sale, Chenoweth caused to be prepared a certificate showing the transfer of title to the purchasers. The Buick car was then delivered by Chenoweth to Shelton and Ivory.

The defendant was not called as a witness. All the testimony, if such there be, which connects or tends to connect the defendant with the procurement of the car in question is that of Chenoweth. He testified that the two men with whom he dealt represented themselves as Deming and Shelton, that they were from Joplin, Missouri, and that when he got back from dinner, around 7 o'clock, these two men were trying to buy a car from his salesman, Owen Vick. We set forth in a footnote the sole testimony which the government relies upon as proof that the defendant was a party to or connected with this transaction.[1] It at once is obvious that this so-called identification of the defendant is so vague and uncertain as to have no probative value. The witness also testified that the checks in payment for the car were handed to him by Shelton and Deming, and all through his testimony he refers to the parties who represented themselves as Shelton and Deming without any further effort to identify the defendant.

Vick, the salesman who apparently spent more time with the purchasers of the car than Chenoweth, testified to certain conversations with two men, and when asked, "Do you recognize the Defendant as being one of the persons, the Defendant Gardner, here, as being one of the persons that was in the place of business?" answered, "I don't recognize this fellow personally." Asked by the court, presumably referring to the defendant Gardner, "You don't remember seeing this gentleman at my immediate right at any time that night?" Vick answered, "I can't recall his face." Shelton, who was called as a witness by the government, testified that Gardner was not present at the time the car was purchased, and in response to a question stated, "Well, to my knowledge, as far as the checks were concerned, as far as these checks that you just gave me, Mr. Gardner, as far as I know, did not know anything about the checks."

---

[1] "Q. (By Mr. Branigin) Did you see the defendant, Marvin Gardner, at your place of business at that time? A. I saw the two gentlemen who bought the cars. They were both in the office at the same time.

"Q. Did you see this defendant in your place of business at that time? A. That is the second gentleman.

"Q. That is the second gentleman? A. Well, they both had their hats on, and that gentleman there is not as familiar with me as another one in the room.

"On cross-examination by Mr. Ward:

"Q. You don't claim that you saw this gentleman at my immediate right at your place of business, do you? A. Well, you know, he was sitting there in the chair with a hat on and sometimes you can't —I would not—I think that is the gentleman but he had his hat on and he was sitting in a slouch position and had his feet on my desk."

Notwithstanding this dearth of proof, the government argues that it can be inferred that Gardner was present and had knowledge of the means employed to obtain the Buick car from Chenoweth. Other than the fact that the defendant drove Ivory and Shelton to Richmond in his car and the abortive identification testimony of Chenoweth, there is absolutely nothing to connect the defendant with the transaction. The positive testimony is that he was at some other place and that he had no knowledge that forged or spurious checks were to be given Chenoweth. An inference of criminality must rest on something more substantial than the imagination of a prosecuting attorney or a trier of the facts.

This appears an appropriate point to consider the proof relative to No. 9638, in which it is charged that the defendant caused the forged checks to be transported in interstate commerce with knowledge that they were forged. After the forged checks (they may better be designated as spurious or non-genuine checks) were delivered to him in the manner heretofore related, Chenoweth, according to his own testimony, called a party in Joplin, Missouri, who informed him "that there wasn't any such people in the town, and he knew that we had been hooked." Chenoweth then immediately took the checks to the police department who telephoned the president of the bank in Joplin on which they purported to be drawn, from whom was received the definite information that the checks were forged or spurious. Thus Chenoweth learned on October 7, 1947, the date on which the checks were received, that they were forgeries. The Buick car which he had sold Shelton and Ivory and for which the checks were accepted in payment was later recovered in Nashville, Tennessee, on October 10, and returned to Chenoweth on October 12.

There is some dispute as to the date on which Chenoweth presented the checks to the Richmond bank, but they were marked "Paid" by the bank on October 14, and it may be safely assumed, we think, that that was the date of their presentation. They were sent by the Richmond bank to the Chicago bank and reached the latter on October 17. Chenoweth deposited the checks in the Richmond bank, so he stated, "for the purpose of making a case from the federal standpoint."

The judgment based upon this charge cannot be affirmed for numerous reasons. In the first place, as already noted, there is not a scintilla of proof that the defendant had anything to do with the making, passing, transporting or attempting to transport them in interstate commerce, nor is there any proof from which it may be reasonably inferred that he had knowledge relative thereto. Moreover, we are of the view that the proof does not establish the charge as to any of the persons named in the indictment, because the transportation was caused by and was that of Chenoweth and nobody else (assuming that the Richmond bank had no knowledge of the situation). While we are referred to no case directly in point, we are of the view that the checks came to rest insofar as interstate commerce is concerned when Chenoweth learned that they were forgeries. It has been held that a stolen motor vehicle recovered before it crosses a state line will not support a charge for its transportation in interstate commerce, knowing it to have been stolen. Hill v. Sanford, 5 Cir., 131 F.2d 417, 418. And it has been held, "The act does not purport to exercise jurisdiction over individuals who receive or sell stolen cars after such cars cease to move in or be a part of interstate commerce." Davidson, et al. v. United States, 8 Cir., 61 F.2d 250, 255. We think the instant situation is analogous and that the Act upon which this cause is predicated does not embrace the factual situation of the instant case.

The government relies upon the recent case of United States v. Sheridan, 329 U.S. 379, 67 S.Ct. 332, 91 L.Ed. 359. That case is readily distinguishable. There, it was the defendant who took the forged checks to a bank and cashed them; he did so knowing that the bank would transport them in interstate commerce, and from a reading of the opinion it may be presumed that the bank had no knowledge that a fraud was being perpetrated upon it. It was in connection with that situation that the court, 329 U.S. at page 391, 67 S.Ct. at page 338, made the statement upon which

the government relies: "One who induces another to do exactly what he intends, and does so by defrauding him, hardly can be held not to 'cause' what is so done." Here, it was not the forger who induced Chenoweth to present the forged checks to the bank, and by no stretch of the imagination can it be said to have been the defendant Gardner. Many days before Chenoweth presented the checks to the Richmond bank the fraud on him had been perpetrated. We are strongly of the view that the Act does not contemplate that a person who has been knowingly defrauded in such manner may step into the shoes of the offender and cause the forged instruments to be placed in interstate commerce for any purpose, much less that "of making a case from the federal standpoint."

This brings us to the controversial and difficult question as to whether the Buick car obtained from Chenoweth by Ivory and Shelton was, after it came into their possession and control, a "stolen motor vehicle" as that term is used in the National Motor Vehicle Theft Act. There is no doubt but that it was obtained by a fraud or, as we might say in Illinois, by means and use of a confidence game.

The question as to whether the motor vehicle was stolen is not material as to No. 9638, in view of what we have held, nor on the conspiracy charge No. 9639, where the crime is dependent upon the conspiracy and not the consummated act. It is only material, therefore, in No. 9637, because if it was not a stolen motor vehicle it would be immaterial what the defendant did in connection with the car after it left Chenoweth's garage. However, in view of the conclusion which we have reached in No. 9637, we think we need not decide the issue as to whether the motor vehicle was stolen. For the purpose of considering the proof in connection with this charge, we shall assume, without deciding, that it was stolen.

This brings us to the proof as to the activities of the defendant subsequent to the evening of October 7, when the Buick car was procured by Shelton and Ivory from Chenoweth. There is no evidence that the defendant at any time either drove, rode in or had possession of the Buick car. There is, therefore, no evidence that he

had anything to do with its actual transportation. The most that the government claims is that he aided, abetted and assisted Shelton and Ivory in its transportation, with knowledge that it was stolen. Having shown that there was no proof of defendant's knowledge as to the manner and means by which possession of the car was acquired by Shelton and Ivory, such knowledge so as to make him criminally responsible must have been acquired subsequently by the defendant. The question then is whether the proof relied upon by the government was sufficient to present a jury question on such issue.

Shelton and Ivory, after they procured the car on the evening of October 7, drove it to Indianapolis where they saw the defendant at his restaurant at about midnight. Later, Shelton and Ivory drove the Buick to Louisville, Kentucky, and the defendant also went there, driving his own car. Shelton testified that the car was not sold in Louisville because the price was not right, and it was brought back to Indianapolis by him and Ivory. Shelton and Ivory (presumably on October 9) drove the Buick to Nashville, Tennessee, and on October 10, were arrested and the car recovered by the police of that city. At that time it bore a Tennessee license plate which had been procured by Shelton and Ivory on that morning. In the hotel room which had been occupied by Shelton and Ivory was found a 1947 Indiana license plate No. 35808. Shelton testified that when the car was driven from Indiana to Nashville, it bore an Indiana license, but that he did not know whether it was the one found in their room. From the circumstances, we think it may be reasonably inferred that it was.

One of the main circumstances relied upon by the government as proof that the defendant aided and abetted in the transportation of the car, as well as knowledge on his part that it was stolen, is the government's contention that this Indiana license plate was procured by the defendant. The testimony by which it was sought to connect the defendant therewith is quite involved but, so far as material, may be briefly stated.

The witness Powers, an employee of the Smith used car lot, testified that the de-

fendant came to the lot on October 9 or 10 and borrowed a set of license plates which were not in use for the purpose, so he stated, of using them on a car which he had bought out in the country and desired to get. At that time, license plates No. 35808, together with other license plates which had been removed from cars for which they had been issued, were in a basket on the desk in the office. Powers testified that it was customary to loan license plates temporarily to used car dealers and that such loans had previously been made to the defendant. According to Powers' testimony, defendant two or three days later returned a set of license plates. Powers was unable to state the number either of the plates borrowed by the defendant or of those which he returned. It is obvious that the plates which the defendant returned could not have been those found in Shelton's room in Nashville. This is so because the recovery in Nashville was made before the defendant made a return of plates to Smith.

The government theorizes, however, that the plates returned to Smith's by the defendant were procured by him from some unknown source and that they were not the same plates as those which he had borrowed. On this theory it is argued that the plates which he borrowed were placed upon the Buick car and remained there until the car reached Nashville, where they were removed and found in Shelton's room. The theory envisions a ruse on the part of the defendant to deceive or conceal from the employee at Smith's place his real purpose in borrowing the plates. The fallacy of the theory lies in the fact that it is without evidentiary support but rests upon an unadulterated suspicion. Undoubtedly, if the defendant procured the license plates to be used by Shelton and Ivory in transporting the car to Nashville, it would be a circumstance showing both that he aided in such transportation and that he had knowledge the car was stolen. The act of procurance, however, having been shown by nothing more than suspicion or guess, it has no probative value for the purpose of connecting the defendant with the transportation charge.

Another bit of alleged testimony by which the government claims to have connected the defendant with license plates No. 35808 is that given by the witness Shelton. According to his testimony, he and Ivory prior to making the trip to Nashville visited Smith's used car lot (presumably October 9). The witness expressed the belief that a set of Indiana plates were there procured and attached to the car, although he did not know the number. He was asked, "Did the defendant get them?" and replied, "Either Mr. Ivory or Mr. Gardner got them." Other than the answer to this question, there is nothing in Shelton's testimony even to indicate that the defendant was present at that time, and it seems obvious that the answer to the question carries no weight inferentially or otherwise that the defendant procured the plates.

Another circumstance relied upon by the government, also based upon the testimony of Shelton, is that the defendant loaned or advanced money to Ivory. Shelton testified that in Indianapolis, prior to the trip to Nashville, the defendant gave him $100.00, to be turned over to Ivory for expenses on the trip, and after they reached Nashville the defendant wired Ivory $140.00 by a Western Union money order. This money was sent by the defendant upon the request of Ivory. The money order was obtained by the defendant in his own name, and "Peter J. Raymond," named as payee, was an alias of Ivory. Shelton also testified that he heard the defendant say that Ivory owed him quite a sum of money and that he expected to be repaid when the car was sold. These money loans, if made for the purpose as stated by Shelton, might be considered, so we think, as proof that the defendant was an aider or abetter in the transportation of the car. But we are unable to discern how they show or tend to show knowledge on the part of the defendant that the transported car was or had been stolen. It appears to us that they were equally consistent with the lack of such knowledge.

The circumstances upon which the government relies to connect the defendant with the offenses charged come in the main from the testimony of Shelton which it is asserted was given unwillingly, but even so such fact cannot be used to enhance its probative value. Its uncertain, vacilating and

worthless nature is illustrated by that portion set forth in the government's brief.[2]

A careful study of this record leads us to the conclusion that the proof is not sufficient to justify a conviction on any of the charges and that there should have been a directed verdict of acquittal. The most that can be said is that the proof raises a suspicion that the defendant in some undisclosed manner participated in the transaction which gave rise to the charges made against him. The inferences indulged in by the government are in the main predicated upon circumstances which have not been proven. This is particularly true on the matter of defendant's knowledge, which is the gist of the offenses charged. And we think this is so of the conspiracy as well as the substantive offenses, because an agreement to transport a motor vehicle in interstate commerce without knowledge that it was stolen, or an agreement to transport or cause to be transported checks in interstate commerce without knowledge that they were fraudulent or forged, would not constitute a criminal conspiracy.

Having concluded that the government's proof is insufficient to sustain the conviction, we are confronted with the problem as to whether the judgments should be reversed and remanded for a new trial or whether we should direct the entry of a judgment of acquittal. It appears that the latter procedure is authorized by the Rules of Criminal Procedure for the District Courts of the United States, 18 U.S.C.A., effective March 21, 1946. For a discussion and analysis of such rules, see United States v. Bozza, 3 Cir., 155 F.2d 592, 596.

The judgments appealed from are, therefore, reversed and remanded, with directions for the entry of a judgment of acquittal as to each charge.

---

[2] "Q. (By Mr. Branigin) Was any statement made to you by the defendant requesting $350 out of your third of the profits of this arrangement? A. Well, I don't exactly recall. * * *

"Q. * * * Did he state to you a question requesting $350 of your part of the proceeds? A. I could not say that. I could not say that he did or did not. I just don't recall. * * *

"Q. Wasn't it true that it was agreed between the three of you that you were going to go over to Richmond and get some cars and divide the proceeds equally? A. No, Mr. Gardner's name was never mentioned to the fact of what proceeds or anything to that affair, as I recall. * * *

"Q. Do you have any recollection as to any arrangement now between the three of you as to how the money was to be divided? A. No, there exactly wasn't anything to that effect."