**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Nimrod SOLOMON and George Sommer,**
**Defendants-Appellants.**

**Nos. 17005–17067.**

United States Court of Appeals,
Seventh Circuit.

Feb. 24, 1970.

Rehearing En Banc Denied April 9, 1970.

**1112**

Warren D. Wolfson, Terence MacCarthy, Federal Defender Program, George Sommer, Chicago, Ill., for appellants.

Thomas A. Foran, U. S. Atty., Sheldon Davidson, Chicago, Ill., John Peter Lulinski, Michael B. Nash, Asst. U. S. Attys., of counsel, for appellee.

Before SWYGERT, CUMMINGS and KERNER, Circuit Judges.

CUMMINGS, Circuit Judge.

Defendants Sommer and Solomon were named in a 2-count indictment along with Lew Farrell and Almer Linkon. Count I charged them with conspiracy to transport a forged check in interstate commerce in violation of 18 U.S.C. §§ 371 and 2314. Count II charged them with the substantive offense of transporting the forged check, prohibited by 18 U.S.C. § 2314. Farrell died before trial and Linkon was acquitted. Solomon and Sommer were found guilty on both counts after a trial before a jury. They each received sentences of five years on the conspiracy count. On the substantive count, Solomon was sentenced to a term of ten years and Sommer to five years, the sentences to run concurrently with the sentences imposed under Count I.

Defendant Solomon contends that the jury lacked sufficient evidence to establish his guilt beyond a reasonable doubt and that his conviction must therefore be set aside. In addition, both defendants claim that they were denied a fair trial because of the treatment of allegedly prejudicial newspaper publicity which appeared during the course of the trial and which, defendants claim, required a mistrial. Finally, defendant Solomon has also taken exception to the *in camera* presentation of a confidential government report and the trial judge's use of that report in consideration of bail pending appeal. We affirm.

*Evidence as to Defendant Solomon*

An integral element in the offense stated by 18 U.S.C. § 2314 is the existence of guilty intent or knowledge. Pauldino v. United States, 379 F.2d 170, 172 (10th Cir. 1967). The defendant must have knowledge that the check involved has been forged and fraudulently made. Barry v. United States, 109 U.S.App.D.C. 301, 287 F.2d 340, 341 (1961); United States v. Gardner, 171 F.2d 753, 759 (7th Cir. 1948). This element is also required where a conspiracy to violate Section 2314 is charged under 18 U.S.C. § 371. United States v. Gardner, *supra*, at pp. 758–759; cf. United States v. Ausmeier, 152 F.2d 349, 356 (2d Cir. 1945). Evidence of such knowledge may be inferred from the particular circumstances and acts and conduct of the parties (Jacobs v. United States, 395 F.2d 469, 472 (8th Cir. 1968)), but it must be clear and unequivocal. Direct Sales Co. v. United States, 319 U.S. 703, 711, 63 S.Ct. 1265, 87 L.Ed. 1674; cf. Miller v. United States, 382 F.2d 583, 587 (9th Cir. 1967). Defendant Solomon claims that the Government has failed to prove this element beyond a reasonable doubt. We are unable to agree.

The criminal activity charged to the defendants occurred against the background of a proposed business loan of $250,000 to Air and Space Manufacturing, Incorporated, an Indiana manufacturer of an aircraft called a "Gyroplane," which is comparable to a helicopter. This loan was being arranged by Fred G. Amick, president of the corporation, initially with Farrell and later with Alan Rosenberg, who died prior to the indictment but is named therein as a co-conspirator.

The evidence reveals that Solomon was well aquainted with codefendant Sommer and with Alan Rosenberg. Solomon was frequently in the company of Rosenberg and occasionally assisted him by running errands "and things like that." Solomon was clearly aware of the details of the proposed Indiana loan. He was present when a mortgage was discussed on September 5, 1966, by Rosenberg and Chicago attorney Cornelius Pitt en route to a Chicago airport where Rosenberg, Pitt and Sommer boarded a plane to Indiana in connection with the loan negotiations. On September 15, 1966, the day the forged check was given to Amick, Rosenberg introduced Solomon to Amick as "David George", and Solomon remained present throughout a Chicago restaurant discussion between Amick and Rosenberg concerning an increase in the initial advance on the loan from $50,000 to $52,500. When Rosenberg stated that he had to "see a man" since the loan was to be increased, he drove off alone with Solomon. After they returned, Solomon accompanied Rosenberg, Sommer and Amick to the Marina City Bank which Sommer entered. When he returned, he had a bank envelope containing the forged check which he passed to Rosenberg. Rosenberg opened the envelope and, after examining its contents, passed it to Amick, stating that it contained his money. Rosenberg then advised Amick not to cash the $52,500 check at the Marina City Bank and added that "this is Chicago. You can't carry that kind of money out of the bank." After spending two hours in their company, Solomon drove Sommer, Rosenberg and Amick to the airport where Sommer and Amick boarded a plane for Indiana.

His knowledge of the details of the loan transaction, his presence during the delivery of the check, and his use of an alias might create no more than grounds for suspicion of Solomon's complicity if considered alone. When considered in connection with the testimony of Jerome Miller, a convicted forger, the evidence shows that Solomon knew the illegal character of the check.

Miller testified that he first met Solomon in August 1965. A year later he again encountered Solomon in the company of Sommer in a Chicago restaurant. The next day Sommer introduced Miller to Rosenberg, and the four men later met again at Rosenberg's home in Skokie, Illinois. On September 12, 1966, Miller received a telephone call from Solomon who requested that he make up some checks, using a check protector possessed by Miller to perforate the amount on the center of the checks. Miller agreed and met Solomon later that morning in front of Miller's apartment building. While they walked through the neighborhood, Solomon handed Miller an envelope containing blank checks and a piece of paper with handwritten names and amounts to be put on the checks. Solomon stated that there was a total of 16 checks in the envelope, of which 14 were to be made up and two were extras to be used in case any were spoiled or otherwise to be given to Miller. When Solomon noticed a Plymouth, apparently containing police, the two men ran through a gangway and Miller placed the envelope containing the checks and paper under a doormat. After informing Solomon that he would contact him when the checks were prepared, Miller returned to his apartment. Miller later returned to recover the envelope and learned from the tenant of the apartment that it had been removed and the landlady had it.

The checks in the envelope strongly appear to have been connected with the scheme for which Solomon was indicted. Although Miller testified that he "believed" the top check in the envelope was a cashier's check on the Fletcher National Bank of Indiana, both women who recovered the checks from under the doormat testified that the checks were cashier's checks from the Marina City Bank. The same type of check from the same bank was ultimately forged and given to Amick no more than five days after this occurrence. In addition, after Miller had reported the loss of the checks, Solomon informed him that Rosenberg was upset with the loss and "that there were some

people waiting in Indiana, a chartered plane was waiting, some people in Washington waiting for these checks, and they were going to be used to take over an aircraft plant." Solomon further indicated that the airplane plant was located in Indiana. Substantially the same information was again communicated to Miller by Solomon when the two met a day or two later and Miller offered to make up some additional checks if any were procured. Solomon was then looking for a check printer.

From this evidence the jury was entirely justified in concluding that Solomon knew and assisted in the forgery of the Marina City Bank's cashier's check which was given to Amick on September 16, 1966. There was ample evidence to connect the checks lost by Miller with the Air and Space Company scheme. From his participation in the events of September 12 and his later actions, the jury could reasonably have inferred that Solomon played a similar role in the subsequent procurement and forgery of the check passed to Amick. The use of the alias of "David George" and the mysterious excursion taken by Solomon and Rosenberg to "see a man" about altering the amount of the cashier's check to be transferred to Amick supports these inferences.

Solomon argues that Miller's testimony concerning the abortive plan to make up 14 checks on September 12 should not have been allowed into evidence. He contends that it involved a different crime from that charged in the indictment and merely inflamed the jury without shedding light on Solomon's mental state. As we have pointed out, the evidence of the occurrences of September 12, taken together with the remarks made by Solomon concerning the use to which the lost checks were to be put and the close proximity in time between the events of September 12 and the delivery of the forged check to Amick on September 16, strongly support the inference that the evidence all related to the charges of the indictment. As the district court judge noted,

> "It is difficult to segregate the [September 12 and 13 or 14 Miller-Solomon] conversations with reference to this airplane plant in Indiana and the checks. You just can't separate it, * * * and for that reason * * * it should go in."

The indictment asserted that the conspiracy began in July 1966 and had as its purpose the obtaining from Amick of $17,500 prepaid "interest" through a counterfeit check, which was to be the first installment of a $250,000 loan to Air and Space Manufacturing Company. It is apparent that the Miller-Solomon transactions were part of the indictment scheme and therefore admissible in evidence. United States v. Wall, 225 F.2d 905, 907 (7th Cir. 1955), certiorari denied, 350 U.S. 935, 76 S.Ct. 307, 100 L.Ed. 816.

■ Even so, Solomon contends that the trial judge should have instructed the jury *sua sponte* that the Miller evidence had a "limited purpose—to show intent and knowledge." Assuming such an instruction could have been demanded, no such instruction was proposed, and no objection to its absence was made.[1] Accordingly, the absence of this instruction may not be assigned as error. Rule 30 of the Federal Rules of Criminal Procedure; United States v. Hutul, 416 F.2d 607, 625 (7th Cir. 1969); United States v. Marine, 413 F.2d 214, 217 (7th Cir. 1969).

We conclude, then, that the evidence was properly admitted and, when considered in the light most favorable to the Government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680, points unequivocally to the guilt of defendant Solomon.

*Failure to Warn Jury Initially Not to Read Newspaper Articles*

Defendant Sommer has joined Solomon in demanding a new trial because of as-

---

1. The court did instruct the jury that defendants were not on trial for any act or conduct not alleged in the indictment.

serted deficiencies in the trial judge's handling of problems arising from the adverse publicity which surrounded defendants' trial. Before the jury was excused at the close of the first day of trial, the district court addressed them as follows:

"Ladies and gentlemen, we are going to recess this case until tomorrow morning, and I just wish to advise the jury to keep their minds free and open until you have heard all of the evidence in this case, the arguments of counsel and the instructions from the Court as to the law. During the period that you are hearing the case, do not discuss it amongst yourselves nor permit anyone else to discuss the case with you. You will have sufficient time to discuss the case amongst yourselves at the time you start your deliberations on your verdict."

■ The trial judge has the obligation to protect the judicial proceedings from "outside interferences" (Sheppard v. Maxwell, 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600), and a warning by the trial judge at the beginning of the proceeding not to read publicity about the trial is advisable. However, neither the Government nor any defendant requested that the court instruct the jury to avoid newspaper accounts bearing on the case. Defendants now contend that United States v. Accardo, 298 F.2d 133 (7th Cir. 1962), and Margoles v. United States, 407 F.2d 727 (7th Cir. 1969), required the court to give such an instruction *sua sponte*.

We do not accept this view of our decisions. Nothing in those opinions can be construed to place the responsibility upon the trial judge to caution jurors against this form of contamination as a matter of course. *Accardo* does not hold that a trial judge must *sua sponte* at the first overnight recess instruct jurors to disregard newspaper articles. There, after giving such an initial caution at the request of defense counsel, the trial judge specifically denied repeated requests for further warnings during the course of the trial of a prominent figure even after substantial adverse publicity had been brought to the judge's attention. Under such circumstances, as Judge Kiley pointed out, it was incumbent upon the trial judge to accede to the defendant's demands and "frequently, prior to separation, [to] call the attention of the jurors *specifically* to the possibility of newspaper accounts carrying statements of facts about the case." 298 F.2d at 136. In *Margoles*, upon counsel's suggestions, the trial judge repeatedly told the jury not to read about the case and we approved his action. However, *Margoles* specifically refused to order *sua sponte* action by the trial judge to supplement the procedures he had used to meet the problems of adverse publicity. 407 F.2d at 734–735.

■ In the instant case, the trial judge questioned the jurors (see *infra*) and gave them frequent and specific instructions once the defendants had brought the adverse publicity and its inherent risks to his attention and requested such instructions. There is no indication or suggestion that, prior to that time, the district judge was even aware of any threat of such publicity. Under these circumstances we decline to fault his conduct.[2] As we stated in *Margoles*, "the court must be notified of any offensive publicity before it can be re-

---

**2.** We need not now decide whether a trial court might be required to caution the jury specifically as to prejudicial publicity absent a request by the defendant where the judge becomes independently aware of threats of adverse publicity or in the case of a trial of significant public interest or involving persons of substantial notoriety. Compare the Report of the Committee on the Operation of the Jury System on the "Free Press—Fair Trial" Issue, 45 F.R. D. 391, 409–410, which would permit a warning either at the request of a party or on the court's own motion, with the American Bar Association's Standards Relating to Fair Trial and Free Press, § 3.5(e), p. 12 (1968), which would require such an instruction in that type of case.

quired to take the necessary precautions." 407 F.2d at 735. The obligation is on counsel to bring the publicity to the court's attention.

*Interrogation of Jurors*

The defendants next charge that the trial judge failed to follow required procedures in determining the possible adverse effects of the publicity upon the jury. They first contend that the court improperly polled the jurors collectively to ascertain whether any had seen the article. They argue that the judge should have questioned each juror out of the presence of the others to determine whether they had read the article.

This same argument has concededly been raised and rejected by this Court on several previous occasions. Margoles v. United States, 407 F.2d 727, 735 (7th Cir. 1969); United States v. Rizzo, 409 F.2d 400, 402 (7th Cir. 1969); United States v. Hutul, 416 F.2d 607, 622 (7th Cir. 1969).[3] Defendants have presented no argument why the collective interrogation permitted by those decisions should now be altered to require a new trial in this case.

Defendants also complain that the trial judge erroneously failed to interrogate individually and out of the presence of other jurors each of the six regular and one alternate jurors who admitted knowledge of the article. He did interrogate each regular juror who acknowledged awareness of the article independently, but did so in the presence of the other jurors. Defendants contend that *Accardo* established the requirement in this Circuit that the exposed individual jurors should not only be separately questioned as to the effect of the publicity but that they must be interrogated out of the presence of the other jurors.

■■■ We agree that this Circuit now requires separate and private interrogation of jurors who have admitted contact with prejudicial publicity. Contrary to the contentions of defendants, however, the rule was not made mandatory by this Court until our recent decision in Margoles v. United States, 407 F.2d 727, 735 (7th Cir. 1969), where we stated:

"Thus, the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further."

This language was intended to require district judges, on proper motion, to examine jurors individually outside the presence of the other jurors to ascertain the possible existence of prejudice.[4] Prior to *Margoles*, however, our opinions merely expressed a preference but

---

3. *Rizzo* and *Hutul* only deal with this aspect of *Margoles* and do not show that the part of *Margoles* dealing with the individual polling of jurors, outside the presence of each other, as to the effect of publicity should be applied retroactively (see *infra*).

4. *Margoles* did not decide whether in certain circumstances a district judge must *sua sponte* conduct such an interrogation, nor do we decide that question. Section 3.5(f) of the American Bar Association's Standards Relating to Fair Trial and Free Press states that the court "may on its own motion or shall on motion of either party" conduct such an interrogation. See Patriarca v. United States, 402 F.2d 314, 318 (1st Cir. 1968), certiorari denied, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567. Here defense counsel failed to request individual polling outside the presence of each other as to the effect of the article. Instead, counsel for one of the defendants only requested individual polling outside the presence of each other as to whether any of them had read the article. Counsel for another defendant did not protest until he moved for a mistrial after both the polling as to reading and the later polling as to effect had been completed.

did not demand adoption of any particular procedure. In *Accardo*, only Judge Kiley ruled in favor of the examination of each juror, out of the presence of the others, to determine the effect of prejudicial articles. Judge Duffy's concurring opinion did not endorse such a rule and instead stated that the trial judge should have repeated his initial admonition not to read the newspapers during the trial. The dissenting opinion of course concluded that the trial judge had adequately guarded the integrity of the jury. Thus in United States v. Jannsen, 339 F.2d 916, 919–920 (7th Cir. 1964), Judge Swygert pointed out that "Accardo did not set down such a rigid rule." [5] Again, in United States v. Largo, 346 F.2d 253, 256 (7th Cir. 1965), the majority went no further than to reiterate the preference for this practice and hint that in a close case the type of examination employed might influence the reviewing court's determination of prejudicial effect.

■ The trial of this case took place approximately eight months before our decision in *Margoles* made the manner of examination employed below improper. We cannot say that the trial judge's reliance upon the apparent acceptability of his procedure was unjustified in view of our previous decisions which tolerated it. The procedure required by *Margoles* is intended to increase the accuracy of the trial judge's determination of the effects of publicity on the jury. While it thus serves to insure unbiased verdicts, we do not believe that the use of a different practice in the trial below necessarily renders the judge's rulings unreliable or otherwise casts doubts upon the veracity of the jury's determination of guilt. Hall v. United States, 396 F.2d 428, 429–430 (10th Cir. 1968), certiorari denied, 393 U.S. 986, 89 S.Ct. 462, 21 L.Ed.2d 447; cf. Johnson v. New Jersey, 384 U.S. 719, 727–730, 86 S.Ct. 1772, 16 L.Ed.2d 882; Halliday v. United States, 394 U.S. 831, 832–833, 89 S.Ct.

1498, 23 L.Ed.2d 16. *Margoles* did not impose the rule sought by these defendants to the 1960 trial of Dr. Margoles. The administration of justice would not be served here by granting retroactive application to *Margoles*. We therefore hold that the salutary rule expressed in that case is obligatory only in trials occurring after March 4, 1969. Cf. United States ex rel. Long v. Pate, 418 F.2d 1028, 1030 (7th Cir. 1970); United States v. Amabile, 395 F.2d 47, 53 (7th Cir. 1968); United States v. Smith, 379 F.2d 628, 633 (7th Cir. 1967).

*Failure to Declare Mistrial Upon Jurors' Exposure to Publicity*

■ We turn now to the defendants' contention that a mistrial should have been declared when six jurors admitted that they had read a June 11, 1968, article which appeared in a Chicago newspaper.[6] During the individual interrogation of the jurors who read the article, the district court learned that none of them had formed an opinion as to the guilt or innocence of the defendants. They claimed their minds were still "free and open" or "fair and impartial," and that no prejudice had been instilled by the article. At the request of defendant Linkon's counsel, the district court then collectively asked these jurors whether they had discussed the article with each other, and this question drew a negative response.

The article involved was captioned "Business Man Tells of Fraud by Loan Shark." In the body of the item, defendant Solomon is twice referred to as a "reputed crime syndicate loan shark." In addition, it states that

"Also named in the indictment were Luigi [Cockeyed Louie] Fratto, 58, of Des Moines, who died of cancer Nov. 24, 1967, and Allan Rosenberg, Linkon's son-in-law, who was slain in gangland fashion March 17, 1967, in Chicago."

5. See also United States v. Palermo, 410 F.2d 468, 471, note 3. (7th Cir. 1969)

6. A somewhat similar article of June 13, 1968, need not be considered, for the jurors advised the trial court that they had not seen it.

Finally, defendant Sommer complains that the article erroneously stated that "Sommer agreed to make an initial loan of $52,000, Amick said, and gave him a check for that amount."

Relying upon the holdings of Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (per curiam), Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663, and Janko v. United States, 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed.2d 846 (per curiam), defendants contend that these statements conveyed prejudicial, inadmissible information which required a mistrial notwithstanding the jurors' protestations of continued impartiality. After reviewing the article in question, we conclude that it contained no remarks of such a grave and inherently prejudicial nature as to raise such a serious doubt of the accuracy of the jurors' response as to call for a new trial.

■■■ Generally, in ruling on a motion for a mistrial,

> "The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 54 L.Ed. 1021. Generalizations beyond that statement are not profitable, because each case must turn upon its own special facts." Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173.

The crucial issue in such cases is not the admissibility or inadmissibility of the publicity, but the degree and pervasiveness of the prejudicial influence possibly resulting.[7] Thus it has only been in exceptional cases that courts have been willing to declare prejudice in a jury's verdict because of the content or volume of the inflammatory publicity surrounding the case. See, e. g., Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600.

In this case, the newspaper article contained admittedly improper remarks. However, as in United States v. Kahaner, 317 F.2d 459, 470 (2d Cir. 1963), certiorari denied sub nom. Corallo v. United States, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65:

> "Comparison of the facts here with the publicity relating to inadmissible prior offenses in Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), or the 'build-up of prejudice' in Irvin v. Dowd, 366 U.S. 717, 725, 81 S.Ct. 1639, 1644, 6 L.Ed.2d 751 (1961), shows the inapplicability of these cases, and of the salutary principle for which they stand."

In this case the article contained none of the massively inflammatory revelations of prior felony convictions, past criminal conduct and admitted and alleged improprieties which characterized the news accounts in Marshall v. United States, 360 U.S. 310, 311–312, 79 S.Ct. 1171, 3 L.Ed.2d 1250. Here the item lacked inadmissible evidence which was strongly probative of guilt in the case at trial, such as the widespread televising of the defendant's confession in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663.[8] Nor finally were the references to Solomon as a "loan shark" or the other improper remarks here comparable to the contents of the account in

---

7. For this reason we are presently unwilling to adopt any firm rule which would apply hard and fast standards for the determination of prejudicial effect. Compare Section 3.5(f) of the American Bar Association's Standards Relating to Fair Trial and Free Press which requires the excuse of any juror aware of the content of reports of a potentially prejudicial nature "if reference to the material in question at the trial itself would have required a mistrial to be declared." Such a rule has much to commend it, both as to substance and ease of administration. Nevertheless, we hesitate to impose it upon trial judges to the exclusion of all other relevant indices of partiality.

8. Cf. Smith v. United States, 385 F.2d 34, 39 (5th Cir. 1967), where the court distinguished an article containing a comment on the defendant's failure to testify from a news account "probative of guilt" such as one containing an excluded confession.

Janko v. United States, 366 U.S. 716, 81 S.Ct. 1662, 6 L.Ed.2d 846 (per curiam). There the defendant was not only referred to as a relative and former employee of a "rackets boss," but also was called a "former convict" who had previously been found guilty of the same charges but was being retried because four jurors at the first trial read news accounts of the charges.[9]

The circumstances of the publicity involved in the present case also lack many of the other features which have led courts to findings of prejudice *per se.* Only a single article reached any of the jurors. It was immediately brought to the attention of the district judge who interrogated the jurors and thereafter repeatedly admonished them to disregard newspaper publicity. He concluded that the jurors responded accurately as well as honestly when they indicated that they remained impartial and capable of rendering a fair verdict.[10] Moreover, while not in itself conclusive, the ability of the jury to remain impartial and acquit defendant Linkon supports the ruling of the trial judge. We conclude, as did the Court in Beck v. Washington, 369 U.S. 541, 557, 82 S.Ct. 955, 964, 8 L.Ed.2d 98:

> "We cannot say the * * * publicity was so intensive and extensive or the examination of the entire panel revealed such prejudice that a court

could not believe the answers of the jurors and would be compelled to find bias or preformed opinion as a matter of law." [11]

*Furnishing of Confidential Report on Defendant Solomon to District Court*

We turn to the last point raised on this appeal. Defendant Solomon objects to the confidential memorandum prepared by the Assistant United States Attorney for the district court's *in camera* inspection in consideration of the Government's request to revoke bail. Solomon claims that the use of this secret report for revocation of bail affected the judge's conclusions as to the proper sentence to impose and denied him due process of law.

In recent decisions, this and other courts have indicated general dissatisfaction with the use of *in camera* inspection of confidential material. In Dennis v. United States, 384 U.S. 855, 874–875, 86 S.Ct. 1840, 16 L.Ed.2d 973, the Supreme Court expressed misgivings concerning the efficacy of this procedure in determining the utility of grand jury minutes. The Court pointed out that *in camera* inspection of the minutes places a substantial burden upon the trial judge to perform what is naturally and properly the function of an advocate. The same inadequacies are even more

9. *Janko* also differs from the instant case in the procedural shortcomings present there. There the court admonished the jurors to disregard news accounts, particularly the item in question, but refused to interrogate the jurors concerning their awareness of the information contained in the prejudicial article or its effect on their objectivity. Under such circumstances it was incumbent upon the reviewing court to assume that the prejudicial article had reached and improperly contaminated the deliberations of the jurors. Cf. United States v. Palermo, 410 F.2d 468, 471–472 (7th Cir. 1969).

10. Cf. Irvin v. Dowd, 366 U.S. 717, 728, 81 S.Ct. 1639, 6 L.Ed.2d 751, where the Supreme Court concluded that the great volume of prejudicial publicity and admissions of several jurors that they had preconceptions of the defendant's guilt

overbalanced the assurances given by all the jurors that they remained impartial.

11. See also, United States v. Mitchell, 319 F.2d 402, 403–404 (7th Cir. 1963); accord on similar facts, see *e. g.*, Hall v. United States, 396 F.2d 428 (10th Cir. 1968), certiorari denied, 393 U.S. 986, 89 S.Ct. 462, 21 L.Ed.2d 447; United States v. Kahaner, 317 F.2d 459, 470–471 (2d Cir. 1963), certiorari denied *sub nom.* Corallo v. United States, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65; United States v. Smith, 393 F.2d 687, 689 (6th Cir. 1968), certiorari denied, 393 U.S. 885, 89 S.Ct. 197, 21 L.Ed.2d 162; Malone v. Crouse, 380 F.2d 741, 744 (10th Cir. 1967), certiorari denied, 390 U.S. 968, 88 S.Ct. 1082, 19 L.Ed.2d 1174; Smith v. United States, 385 F.2d 34, 39 (5th Cir. 1967).

apparent where the court must consider factual assertions concerning the conduct or character of the defendant. Such a practice, if used to ascertain the guilt of the accused in the first instance, would contradict the most fundamental of procedural requirements imposed by the Constitution. Reliance upon such *in camera* material in post-conviction proceedings is also objectionable where no opportunity exists for rebuttal by the defendant.

In Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690, the Supreme Court struck down a sentence whose duration was predicated upon materially false factual conclusions drawn by the trial judge:

> "It is not the duration or severity of this sentence that renders it constitutionally invalid; it is the careless or designed pronouncement of sentence on a foundation so extensively and materially false, which the prisoner had no opportunity to correct by the services which counsel would provide, that renders the proceedings lacking in due process." 334 U.S. at 741, 68 S.Ct. at 1255.

By the same token, however, a defendant's position is little improved by availability of counsel where a confidential report proffered by the prosecution contains false or misleading statements which go uncorrected because of unnecessary secrecy. Cf. United States ex rel. Jackson v. Myers, 374 F.2d 707 (3d Cir. 1967). The broad discretion vested in the trial judge in post-conviction proceedings makes adequate supervision and review of substantive determinations difficult. Under such circumstances procedural safeguards, such as disclosure and the opportunity for rebuttal, are all the more necessary to insure fair and accurate application of the standards prescribed by Congress for fixing sentences.

The Government has sought to justify the submission of the confidential report in this case by reference to Ward v. United States, 76 S.Ct. 1063, 1066,[12] but that opinion fails to justify the practice adopted here. In *Ward*, Justice Frankfurter merely noted that the trial judge's conclusion of the likelihood of flight by the defendant was based upon confidential probation reports and should not be rejected for that reason. He expressed no approval of the practice involved. In Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337, cited by Justice Frankfurter, the Court simply refused to read the due process clause of the Fourteenth Amendment to require a state to grant an evidentiary hearing with notice of charges and the opportunity to examine witnesses before relying upon information contained in a probation report. Moreover, in *Williams*, the trial judge had apparently expounded the pertinent facts supplied by the report upon which he relied before the defendant's attorney. The Supreme Court further noted that

> "The accuracy of the statements made by the judge as to appellant's background and past practices was not challenged by appellant or his counsel, nor was the judge asked to disregard any of them or to afford appellant a chance to refute or discredit any of them by cross-examination or otherwise." 337 U.S. at 244, 69 S.Ct. at 1081.

■ We are unable to extrapolate from these decisions an approbation of the practice here involved. The report in this case was prepared and presented by the prosecutor, not by an independent probation officer at the request of the judge. Under Rule 32(c) (2) of the Federal Rules of Criminal Procedure the discretionary power of the trial judge to determine the extent and manner of disclosure of the probation officer's presentence report is not unfettered (see Baker v. United States, 388 F.2d 931, 933–934 (4th Cir. 1968)) and should be liberally applied. United States v.

---

12. The opinion was rendered by Justice Frankfurter as Circuit Justice and concerned bail pending appeal. It is not officially reported.

Fischer, 381 F.2d 509 (2d Cir. 1967), certiorari denied, 390 U.S. 973, 88 S.Ct. 1064, 19 L.Ed.2d 1185; see generally 8A Moore, Federal Practice, ¶ 32.03 [4] (1969). Moreover, in the present case, the prosecutor's adversary position in the criminal proceedings, inevitably raising doubts concerning his complete impartiality and accuracy, distinguishes the treatment of prosecutorial reports from those supplied by "professional neutrals such as a probation officer." Haller v. Robbins, 409 F.2d 857, 859 (1st Cir. 1969).

■ Because of this Court's supervisory function, we need not now rest our conclusion on the constitutional dictates of due process. Compare Haller v. Robbins, *supra*, at 859. Nor are we blind to the need to adapt disclosure to the proceedings involved and the legitimate interests of the Government in the necessary maintenance of properly secret information. Where secrecy is called for, however, the district court should either permit disclosure of the material to defendant's counsel with proper protective instructions or state in detail the grounds in the prosecutorial memorandum that are pertinent to the revocation of bail or other post-conviction action. It is not necessary to require a formal evidentiary hearing in order to grant the defendant an opportunity to respond to the prosecutorial report. Cf. Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337; Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326. While a hearing might be appropriate in some cases (see Note, Procedural Due Process at Judicial Sentencing for Felony, 81 Harv.L.Rev. 821, 826–829 (1968)), other forms of rebuttal are also compatible with the nature of the proceedings and should be adequate to achieve a fair balance of the conflicting interests at stake. Cf. United States v. White, 382 F.2d 445, 450 (7th Cir. 1967) (dissenting opinion); Haller v. Robbins, 409 F.2d 857, 860 (1st Cir. 1969); Smith v. United States, 238 F.2d 925, 931 (5th Cir. 1956); see also Steele,

Counsel Can Count in Federal Sentencing, 56 A.B.A.J. 37, 38 (1970).

■ Turning to the instant case, we find that the Government presented the report to the trial court for the purpose of showing that Solomon was a danger to other persons and to the community within the meaning of 18 U.S.C. § 3148, the Bail Reform Act. Solomon does not raise the issue of confidentiality as a challenge to the court's decision concerning bail pending appeal. Rather he urges that the secret memorandum should not have been submitted to the trial judge four days before sentence was to be imposed. He contends that this at least subconsciously affected the resulting sentence imposed upon him. While the procedure was improper, no satisfactory relief could be granted in this case. The trial judge repeatedly stated that the information submitted to him *in camera* was considered only in respect to bail. After our own review of the confidential memorandum we are inclined to accept those statements and conclude that the residual effect of the report upon the sentencing, if existent, does not warrant reconsideration of the sentence by the trial judge after disclosure of the pertinent details. Hereafter in this Circuit, however, a trial court shall not consider *in camera* a prosecutor's report about a defendant prior to sentencing or ruling on post-conviction motions unless the pertinent factual information is summarized for or disclosed to defense counsel with appropriate safeguards.

The Court is most appreciative of the diligent and resourceful representation of defendant Sommer by Terence Mac-Carthy of the Chicago Bar, serving as appointed counsel under the Criminal Justice Act.

The judgments are affirmed.

SWYGERT, Circuit Judge (dissenting).

On the morning of the second day of the trial of this case, the Chicago Trib-

une carried a news story which read in part:

BUSINESS MAN
TELLS OF FRAUD
BY LOAN SHARK
Testifies in Trial in
Federal Court

A Muncie, Ind., business executive testified yesterday in federal District court that a reputed crime syndicate loan shark and four other persons bilked him after offering to loan him $250,000.

On trial before Judge Alexander J. Napoli are Nimrod [Timmy] Solomon, 38, of 208 Willow st., reputed crime syndicate loan shark; George Sommer, 27, formerly of Los Angeles; and Almer Linkon, 49, of 5701 Sheridan rd.

They are charged with conspiring to violate the federal fraud laws and with transporting a counterfeit $52,000 cashier's check across state lines from Chicago to North Vernon, Ind.

\* \* \* \* \* \*

Also named in the indictment were Luigi [Cockeyed Louie] Fratto, 58, of Des Moines, who died of cancer Nov. 24, 1967, and Allan Rosenberg, Linkon's son-in-law, who was slain in gangland fashion March 17, 1967, in Chicago.

When the trial resumed, defense counsel called the trial judge's attention to the article and moved for a mistrial or alternatively for the judge to interrogate the jurors individually. The judge refused to grant a mistrial, but did question the jurors individually while they were in the jury box. Six jurors and one alternate juror admitted they had read part or all of the article, but, in response to the judge's further questioning, each said that his judgment would not be affected by the article. Defense counsel objected to the interrogation procedure, requesting that the jurors be questioned separately in chambers. The request was denied.

This newspaper article was highly prejudicial and inflammatory. The head-line alone suggests that fraud—the very issue before the jury—was involved and characterizes one of the defendants by the opprobrious term, "loan shark." The body of the article twice characterizes defendant Solomon as a "reputed crime syndicate loan shark." Others named in the indictment are referred to as Luigi (Cockeyed Louie) Fratto and Allan Rosenberg, "who was slain in gangland fashion." The article taken as a whole strongly suggests that the defendants are disreputable or dangerous characters and members or associates of an organized crime "mob."

I believe that this case is controlled by Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), and later cases such as Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed. 2d 663 (1963), and Janko v. United States, 366 U.S. 716, 81 S.Ct. 1662, 6 L. Ed.2d 846 (1961), rev'g per curiam, 281 F.2d 156 (8th Cir. 1960). These cases stand for the proposition that publicity may be of such a character that a juror exposed to it will be presumed prejudiced regardless of whether he says he can remain impartial. I see no essential difference between the newspaper reference in *Marshall* to the defendant's prior convictions and his history as an unlicensed physician and the reference here to Solomon's relation to the crime syndicate and his activities as a "loan shark." Similarly, in *Janko* the defendant was referred to in a St. Louis newspaper as a "former employee of the east side rackets' boss Frank (Buster) Wortman."

In future cases I would prefer that we adopt the standard proposed by the American Bar Association's Standards Relating To Fair Trial And Free Press, § 3.5(f) (1968). Under that standard a juror is subject to challenge if the potential prejudicial material to which he has been exposed "would furnish grounds for a mistrial if referred to in the trial itself." Measured by that standard, the adverse publicity contained in the article in question would require a mistrial.

I would also reverse in light of the failure of the trial judge to comply with the

rule established in United States v. Accardo, 298 F.2d 133 (7th Cir. 1962), and restated in United States v. Margoles, 407 F.2d 727 (7th Cir. 1969). In *Accardo* after observing that there is no certainty that' jurors will admit they were influenced by prejudicial publicity, citing Coppedge v. United States, 106 U.S.App.D.C. 275, 272 F.2d 504 (1959), Judge Kiley wrote: "He [the trial judge] should have, by the careful examination of each juror, out of the presence of the others, determined the effect of the articles on those who had read them and whether they had discussed the articles with others. * * * These individual interviews would have tended to overcome reluctance to speak out."

In *Margoles* Chief Judge Castle after discussing *Accardo* and two subsequent decisions of this court, United States v. Jannsen, 339 F.2d 916 (7th Cir. 1964), and United States v. Largo, 346 F.2d 253 (7th Cir. 1965), stated:

> Thus, the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further.

I am unable to agree with the majority that prior to *Margoles* this court's opinions "merely expressed a preference" that jurors exposed to adverse publicity be examined out of the presence of the other jurors, but did not demand "adoption of any particular procedure." Judge Kiley's language in *Accardo* is unequivocal and was so interpreted by Chief Judge Castle in *Margoles, supra,* 407 F. 2d at 734–735. Furthermore, neither *Jannsen* nor *Largo* modified the *Accardo* rule in a substantial manner.

In *Jannsen* we held that strict compliance with the *Accardo* rule was unnecessary since each juror denied having read the adverse publicity. We concluded "precautions that might have been required in interrogating jurors who had read a newspaper account need not have been taken" in those circumstances. In *Largo* this court held that under the facts of that case no error was committed by not following the *Accardo* rule. However, Judge Knoch, speaking for the majority, voiced the caveat: "We believe the better practice is to interview each juror singly out of the presence of all of the other jurors. If the evidence adduced at the trial here had presented a close issue of guilt or innocence, we might well have concluded that prejudicial error existed in this case." For these reasons, I do not believe that *Margoles* announced a new rule for this circuit, but merely restated the *Accardo* rule with the added refinement prescribed in *Jannsen.*

Assuming, arguendo, that *Margoles* did establish for the first time in this circuit a fixed rather than a preferred rule, I find nothing in that decision to indicate that it should not be applied retroactively. That such treatment was not intended is corroborated by two cases decided by this court after the *Margoles* decision, United States v. Rizzo, 409 F.2d 400 (7th Cir. 1969), United States v. Hutul, 416 F.2d 607 (7th Cir. 1969). Both cases involve trials which took place prior to this court's decision in *Margoles.* Each opinion cites the *Margoles* rule and implies that *Margoles* would govern if the facts of those cases had called for its application.

SWYGERT, J., voted to grant.