Milton **MARGOLES**, Petitioner-Appellant,

v.

**UNITED STATES** of America,
Respondent-Appellee.

**No. 16812.**

United States Court of Appeals
Seventh Circuit.

March 4, 1969.

John P. Diuguid, Louis M. Kaplan, Philip A. Gorelick, Washington, D. C., James M. Shellow, Milwaukee, Wis., for appellant, Carr, Bonner, O'Connell, Kaplan & Scott, Washington, D. C., Shellow, Shellow & Coffey, Milwaukee, Wis., of counsel.

James B. Brennan, U. S. Atty., Richard E. Reilly, Robert J. Lerner, Asst. U. S. Attys., Milwaukee, Wis., for appellee.

Before CASTLE, Chief Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

CASTLE, Chief Judge.

This appeal arises from the denial by the district court of petitioner's motion to vacate his sentence, under 28 U.S.C. § 2255. Petitioner was convicted in 1960 of attempting to obstruct justice and unlawfully influence a federal officer, in violation of 18 U.S.C. § 1503. The case arose out of an alleged attempted bribe of a federal judge who had previously sentenced petitioner to a one-year prison term after a plea of *nolo contendere* to charges of income tax evasion.[1] Petitioner's conviction for obstructing justice was affirmed by this court in United States v. Margoles, 294 F.2d 371 (7th Cir. 1961), in which the issues presented on this appeal were not raised.

Specifically, those issues concern petitioner's contention that because of widespread prejudicial publicity regarding the alleged bribery, he was denied his constitutional right to a fair trial. The main question centers around the conduct of the trial judge, toward the prospective and chosen jurors, in taking precautions against the effect of the publicity, both before and during the trial.

Petitioner's defense at trial was entrapment. Thus, the issue presented to the jury turned on the question of whose version of the transaction was to be believed—petitioner's or the Government's chief witness. The jury returned a verdict of not guilty on the bribery count and guilty on the other two counts. Petitioner has served the two concurrent five-year sentences imposed by the district court and his parole expired on October 20, 1966.

Since the existence of prejudicial publicity both before and during the trial present different legal issues, we shall discuss each separately.

## I. PRETRIAL PUBLICITY

The pretrial publicity consisted mainly of twenty-four different articles in Milwaukee's two major newspapers, which appeared on sixteen separate days on either the front page or the "second front page."[2] The combined circulation of

---

1. Petitioner was acquitted by the jury of a bribery count contained in an earlier indictment involving the same set of facts.

2. The first page of the local news section.

these two newspapers reaches the great majority of households in Milwaukee County, where the trial was held. Comparable radio and television coverage is also alleged by petitioner.

Petitioner contends that most of the newspaper articles were harmful to him, that many were inaccurate, and that Government officials assisted the press in obtaining the information used in the articles. Perhaps the primary example of prejudicial pre-trial publicity cited by petitioner is contained in two articles which concerned a letter, made public by the judge who was the object of the attempted bribe, praising the informer who, according to the judge, "unwittingly and innocently became the vehicle for the alleged attempt by Dr. Milton Margoles to bribe" the judge. This article and the letter on which it was based, petitioner claims, destroyed the defense of entrapment, which was petitioner's only defense presented at trial.

Petitioner's counsel did not move for a continuance on the basis of the publicity, although a continuance was requested on other grounds. The trial court, however, began its handling of the case on the assumption that there was possible prejudicial publicity. Although most of the newspaper articles appeared some time before the trial began, the response of some of the veniremen indicated that the publicity surrounding this case was in fact known to at least some of the prospective jurors. Assuming for purposes of this opinion that prejudicial publicity was present, the question before us is whether the procedures employed by the trial court adequately protected petitioner's right to a fair trial.

Petitioner contends that the district court "did virtually nothing to safeguard the accused's constitutional right to have his guilt or innocence determined by an unbiased jury." We strongly disagree. The record discloses that the trial court thoroughly instructed and questioned the jurors on the effect of the publicity. During the *voir dire* examination, the court began by stating:

"It may be that you have read in the newspapers, or heard on the radio, or perhaps even on television, about this that we are now starting; or learned something about it through conversation with other people. If you have, as a result of such newspaper reports, radio or television broadcasts, or conversations with others * * * formed any opinion or expressed any opinion whatsoever regarding the guilt or innocence of the defendant, you should so indicate. In other words, I will put this question again to you: If, as the result of newspaper reports, radio or television broadcasts, or conversations with others, you * * * formed any opinion or expressed any opinion whatsoever regarding the guilt or innocence of the defendant, Milton Margoles, you should so indicate. * * * I am not indicating by that question that you are disqualified if you formed any opinion with regard to the guilt or innocence of the defendant as a result of what you may have read or heard about this case. I am only asking now whether or not you have formed or expressed any opinion on the subject matter."

After further explanation by the court, some veniremen responded that they had read about the case. All but one of these were ultimately excused from jury duty. That one, Mr. Dix, was examined by the court and later by defense counsel. The following dialogue took place between the court and Mr. Dix:

"The Court: In other words, you wouldn't let any views you have heretofore had in your mind about this case—you would not permit that to interfere with your fairness and your impartiality as a juror?

* * * * * *

Mr. Dix: I think so.

* * * * * *

The Court: Regardless of what you may have read?

Mr. Dix: Yes.

The Court: What you thought, or the reactions which you had from the newspaper reports, or any information

you got about this case, you could remove that and decide this case on the basis of the evidence and the law that you hear in the courtroom?

Mr. Dix: Yes.

The Court: Any question about it in your mind?

Mr. Dix: No."

There then followed more extensive instructions and questions by the court, including a strong, thorough statement on the presumption of innocence. Similar statements were later made by defense counsel. From the responses given by some of the veniremen, there does not appear to have been any hesitance on their part to answer frankly and candidly. Indeed, both the court and counsel commendably created an atmosphere conducive to honest admissions by the jurors. Those who admitted that they had formed a prejudicial opinion about the case were excused and defense counsel voiced no objection to either the method of examination or to the jurors who were finally selected.

■ We hold that the procedures employed by the district court at the *voir dire* examination of prospective jurors were adequate to safeguard petitioner against the effect of prejudicial pre-trial publicity, protected his right to a fair trial, and met the standards set by the Supreme Court and by this Court in dealing with similar cases.

In Irvin v. Doud, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Supreme Court, in a case involving prejudicial pre-trial publicity, set out the applicable standards:

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true

in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Spies v. [People of State of] Illinois, 123 U.S. 131 [8 S.Ct. 21, 31 L.Ed. 80]; Holt v. United States, 218 U.S. 245 [31 S.Ct. 2, 54 L.Ed. 1021]; Reynolds v. United States, supra [98 U.S. 145, 25 L.Ed. 244].

"The adoption of such a rule, however, cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law. Lisenba v. [People of State of] California, 314 U.S. 219, 236 [62 S.Ct. 280, 290, 86 L.Ed. 166]. As stated in *Reynolds*, the test is 'whether the nature and strength of the opinion formed are such as in law necessarily * * * raise the presumption of partiality. The question thus presented is one of mixed law and fact * * *.' At page 156 [of 98 U.S.] . 'The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside * * *. If a positive and decided opinion had been formed, he would have been incompetent even though it had not been expressed.' At page 157 [of 98 U.S.]. As was stated in Brown v. Allen, 344 U.S. 443, 507 [73 S.Ct. 397, 446, 97 L.Ed. 469], the 'so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge.' It was, therefore, the duty of the Court of Appeals to independently evaluate the *voir dire* testimony of the impanel-

ed jurors." 366 U.S. at 722–723, 81 S.Ct. at 1642.[3]

The Supreme Court found that the *voir dire* examination showed a pattern of deep and bitter prejudice throughout the community. Ninety percent of the 430 prospective jurors "entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty." 366 U.S. at 727, 81 S.Ct. at 1645. Eight out of the twelve jurors finally empaneled thought Irvin was guilty. Under these and other factors present, including the fact that defense counsel had exhausted his maximum of 20 peremptory challenges, the Court found that a presumption of partiality was affirmatively established.

In the instant case, however, only a few prospective jurors had read about the case and formed any opinion and only one of these was empaneled, without objection, on the jury. His extensive questioning, as well as that of all the veniremen, seemed to satisfy both the court and counsel as to his and the rest of the jury's impartiality. Moreover, petitioner did not exhaust his peremptory challenges.

■ ■ Therefore, under the standards set out in Irvin v. Dowd, our independent evaluation of the *voir dire* testimony discloses nothing which would raise a presumption of partiality in any of the jurors. The thorough *voir dire* examination conducted by both the court and counsel adequately protected petitioner's right to be tried by a jury composed of unbiased, impartial jurors.

Petitioner also argues that the trial court's failure to control the release of pre-trial prejudicial information, grant a continuance, change venue, or empanel veniremen from a distant part of the judicial district was reversible error. Since such action was not requested by counsel, petitioner apparently argues that the court should have raised these questions *sua sponte*. Petitioner places

heavy reliance on Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) in his argument on these points. We agree that *Sheppard* is an important case in this area, but do not believe that it compels reversal in the instant case. While most of the *Sheppard* opinion is devoted to the effects of prejudicial publicity and conduct occurring during the trial, some of the language applies to pre-trial publicity as well.

■ Thus, while the *Sheppard* decision discusses the methods which, in that case, should have been employed by the trial court to control the release and publication of abusive publicity, 384 U.S. at 361, 86 S.Ct. at 1521, the Court was referring only to publicity occurring after judicial proceedings had begun. Obviously, a court is powerless to control news coverage occurring before it has any jurisdiction or before such coverage can be brought to its attention. We refuse to hold a court to such a meaningless and impossible standard as advanced by petitioner.

■ ■ Regarding the denial of a continuance, it must be noted that the continuance was requested on other grounds which are not contested on this appeal.[4] If counsel believed that the publicity was dissipated sufficiently by the time of trial so that a *voir dire* examination could weed out any undesirable jurors, the court should not, except in the most extreme circumstances, be expected to raise the issue of a continuance *sua sponte*. *Sheppard* does not differ with this conclusion. It held that the trial court should have raised the issue of jury sequestration and possibly control of publicity *sua sponte*, 384 U.S. at 363, 86 S.Ct. at 1522, but did not imply that in all cases involving pre-trial publicity the court necessarily must raise or invoke, *sua sponte*, all protective measures. Of course in *Sheppard*, motions for a continuance and for a change of venue were expressly made by counsel and thus

---

3. See also United States v. Hoffa, 367 F. 2d 698, 710–711 (7th Cir.1966), remanded on other ground, 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967).

4. Moreover, two previous continuances had been granted.

were dealt with on that basis. However, while we do not believe that justice should take a role secondary to the adversary process of criminal law, we cannot hold that a trial judge is required to raise all questions concerning the necessity for protective measures. Therefore, as here, in the absence of unusual circumstances, motions for such measures as petitioner advocates in the case at bar must be made by the defendant or his counsel.

■ Petitioner's final argument regarding pre-trial publicity is that the prospective jurors should have been examined individually at the *voir dire* examination. Besides the fact that petitioner did not request such an examination, there is no authority for this contention. Indeed, especially in a case involving a large number of prospective jurors,[5] such a procedure would be overburdensome and would probably provide no greater protection than the procedures employed in the instant case. As previously pointed out, the jurors in the case before us did not seem inhibited by the fact that the other veniremen were present. It seems equally plausible that the average layman would become inhibited if he were called individually into the chambers of a federal judge as he would in the presence of his peers. Therefore, we hold that individual questioning of veniremen on pre-trial *voir dire* examination was not required here.

## II. PUBLICITY DURING THE TRIAL

In all but two instances, the news coverage of petitioner's trial merely reported the factual details of the proceedings, including testimony of witnesses. However, on the second day of the trial the Milwaukee Journal published the names, ages, and addresses of the jurors; and on the fourth day of trial the same newspaper published the substance of the testimony of one Government witness, given outside the jury's presence, which was held inadmissible by the district court.

Petitioner's first contention under this point is that the trial court committed error by failing to sequester the jury and the witnesses, and in failing to caution or control the press and the parties in the release of prejudicial news coverage. Again, the most important recent case in this area is Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), in which the court held that the trial judge should have raised the issue of sequestration *sua sponte* and that "the courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences." 384 U.S. at 363, 86 S.Ct. at 1522. Under the facts present in the instant case, the procedures required by the Supreme Court in *Sheppard* are inapplicable.

We do not suggest that the *Sheppard* case should be strictly confined to its facts. It is important to note, however, that the facts of that case disclose some of the most abusive and prejudicial news coverage of a criminal trial in modern judicial history. The publicity was overwhelming in both quantity and prejudicial content, and it continued for months up to and during the trial itself. The news media went far beyond their reporting function and called upon public officials, the judge, and the jury to convict the defendant in the name of "justice." Moreover, the many appeals to the trial court brought by defense counsel to take steps to protect the defendant's right to a fair trial were all but ignored by the trial judge (who, along with the prosecutor, was running for judicial office at the time). Motions for change of venue on the ground of prejudicial publicity were denied, as were motions for mistrial and continuance. In addition, the judge refused defense counsel's numerous requests to ask the jurors if they had read or heard any of the news coverage, and to ascertain the effect it had on them. The actual content of the publicity was aggravated in its prejudicial effect by the trial court's allowing

5. In the instant case, 45 veniremen were sworn.

the press "free rein" of the courtroom, including the "unprecedented" conduct of allowing numbers of reporters inside the bar of the court itself. 384 U.S. at 355, 86 S.Ct. at 1518.

Because of these events the Supreme Court held that the trial court should have insulated the trial from much of the publicity by various means, including: restricting use of the courtroom by newsmen (as defense counsel had requested); limiting the number of reporters in the courtroom, whose presence disrupted the trial; forbidding the presence of reporters inside the bar of the court, which destroyed the defendant's right to talk in privacy with his counsel; instructing witnesses, parties and especially government officials not to discuss the case with newsmen; and warning newspapers to check the accuracy of their accounts of the testimony.

In the instant case, however, most of the news coverage ended some time before the trial took place. Most of the stories merely related—albeit somewhat one-sidedly—the facts of the case, and none called for public vengeance. Moreover, and most importantly, the district judge affirmatively responded to counsel's suggestions as to how to protect petitioner from prejudicial news coverage. He strongly and repeatedly admonished the jury throughout the trial not to read or listen to any news coverage of the case and not to discuss it with anyone.

■ ■ Thus, although the *Sheppard* case should not be strictly confined to its facts, it does not suggest that courts should sequester the jury or witnesses, *sua sponte,* in every case involving prejudicial publicity. Nor does *Sheppard* hold that trial courts must take strong measures against the press or the parties in every such case. Rather, we read *Sheppard* as holding that the courts should not passively allow gross abuses by the news media in the guise of "freedom of the press." The Supreme Court recognized that "justice cannot survive behind walls of silence." The Court stated that it has been unwilling "to

place any direct limitations on the freedom traditionally exercised by the news media for '[w]hat transpires in the court room is public property.'" (citing Craig v. Harney, 331 U.S. 367, 374, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947)). Thus, "where there was no threat or menace to the integrity of the trial" the courts should refrain from controlling news coverage of a case; but when such threat arises, the court should take appropriate steps to protect its integrity. 384 U.S. at 349–350, 86 S.Ct. 1515–1516. The nature of the measures taken by the trial court should, therefore, depend upon the severity of the threat to the integrity of the trial. Each case must, of course, be decided on its own facts. United States v. Largo, 346 F.2d 253, 256 (7th Cir. 1965); United States v. Accardo, 298 F.2d 133, 136 (7th Cir. 1962).

■ On this basis, we hold that those threats arising in the instant case were adequately dealt with by the district court and that sequestration of the jury and control of the press were not, therefore, required. The first such threat involved the publication of the names and addresses of the jurors, resulting in most of them receiving anonymous mail during the trial, which concerned the case. After extensive, individual questioning of each juror and alternate, a motion for mistrial was made by petitioner's counsel, and was denied. Since the denial of this motion is not alleged as error on this appeal or in the petition before the district court, we need not consider it. We do note, however, that a reading of the transcript of the proceedings discloses that all the jurors took their duty very seriously and ignored the anonymous letters they received.

■ The only other threat to the integrity of the trial was the publishing of the inadmissible testimony on the fourth day of trial. There is no doubt that such publication was an abuse of power by the press and should be condemned. The jury's verdict must be based on evidence received in open court, not from outside sources, Sheppard v.

Maxwell, 384 U.S. 333, 351, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and the exposure of jurors, through news accounts, to information which was not admitted at trial may be grounds for reversal. Marshall v. United States, 360 U.S. 310, 313, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). Therefore, once the existence of a news account of inadmissible evidence is brought to the attention of the trial court, as was done in the instant case, the court is required to take appropriate steps to insure that the jurors had not been exposed to or prejudiced by such accounts.

 The issue presented in the case at bar, therefore, is whether the steps taken by the district court were appropriate. Specifically, petitioner contends that the court should have examined each juror individually and outside the presence of his fellow jurors, rather than conducting the inquiry on a collective basis. We disagree.

In the instant case, defense counsel brought the articles and broadcast to the court's attention and made the following motion: "My motion is, if the court please, to examine the jurors and ask each one *or all collectively* whether any of them read anything in the newspapers regarding any proceedings that took place outside of the presence of the court. * * *" (emphasis ours). The court granted this motion and stated to the jury:

"Ladies and gentlemen, I have given you certain admonitions. I am going to ask you three questions, and they are going to be collective. However, I would like to have you understand that these questions that I ask are directed to each of you individually, so when I ask the question it will be a question that you will answer individually.

"I think I should preface my questions by saying this: By my asking these questions, I do not wish to imply anything except to ask the questions and except that I assume and will understand that you are answering the questions truthfully. As to the signifi-

cance of your reply, that is something that you need not speculate upon.

"The first question that I would like to ask is this: Did any of you read any news item which appeared in the Milwaukee Journal last evening relating to this case? And I have particular reference to the one-sheet part of the Journal which is of orange color. Did any of you read that news item? I understand that there is no one who says that he did. I am right in that question, I believe, the way you are now answering.

"Second, did any of you read any news item appearing in the Milwaukee Sentinel relating to this case which appeared in this morning's paper? By your silence, I understand that you did not.

"The third question, did any of you see the newscast on Channel 4, Milwaukee, last evening? By your silence, I understand that you did not.

"Thank you, ladies and gentlemen, for your answers."

There was no objection by counsel to this procedure and, in fact, it was precisely what counsel had asked for in his motion. Although petitioner now claims that the inquiry should have been made of each juror individually, we hold that the collective questioning was proper.

In United States v. Accardo, 298 F.2d 133, 136 (7th Cir. 1962), this court reversed the defendant's conviction, partly on the basis of inadequate protection of the defendant's right to a fair trial due to prejudicial publicity. The court held that frequent admonitions to the jury calling "the attention of the jurors *specifically* to the possibility of newspaper accounts * * *" were required. As we have already noted, such admonitions were frequently given in the instant case.

The *Accardo* decision went on to hold that the trial judge "should have, by the careful examination of each juror, out of the presence of the others, determined the effect of the articles on those who had read them and whether they

discussed the articles with others." 298 F.2d at 136. This court in United States v. Largo, 346 F.2d 253, at 256 (7th Cir. 1965), in commenting upon *Accardo,* stated that "the better practice is to interview each juror singly out of the presence of all of the other jurors"; but *Largo* went on to hold that since the issue of guilt or innocence was not close, there was no prejudicial error committed.

■■ Thus, the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further. We therefore find that the district court took adequate precautionary measures to protect petitioner's right to a fair trial.

Since no other publicity was brought to the trial court's attention, and since the court must be notified of any offensive publicity before it can be required to take the necessary precautions, we find no further area of contention regarding prejudicial publicity in the instant case.

■■ Petitioner's last contention, that the trial court improperly instructed the jury as to burden of proof, is without merit since the instruction in question was not objected to below and since this issue is improperly raised on a collateral attack under § 2255. See United States v. Jonikas, 197 F.2d 675, 676 (7th Cir. 1952), Campbell v. United States, 355 F.2d 394 (7th Cir. 1966).

For the foregoing reasons, the judgment below is affirmed.

Affirmed.