282 N.E.2d 854 (1972)
Raymond LINDSEY, Appellant,
v.
STATE of Indiana, Appellee.
No. 172A29.
Court of Appeals of Indiana, Third District.
May 23, 1972.
Rehearing Denied June 20, 1972.
*856 Patrick Brennan, Larry L. Ambler, South Bend, for appellant.
Theodore L. Sendak, Atty. Gen. by Darrel K. Diamond, Deputy Atty. Gen., for appellee.
SHARP, Judge.
The Appellant was charged by way of affidavit with the offense of first degree burglary which allegedly occurred on the 3rd day of July, 1970, in St. Joseph County, Indiana. The affidavit was filed against him on the 23rd of July, 1970, and thereafter the Appellant entered a plea of not guilty by reason of insanity. The Appellant filed a motion to be examined as a possible criminal sexual psychopath on the 15th of March, 1971, and the court appointed two psychiatrists to examine the Appellant and report to the court. On July 11, 1971, the trial court overruled the Appellant's request for a hearing to adjudicate the Appellant as a criminal sexual psychopath. The Appellant also filed a motion to suppress certain identification evidence, which will be discussed in more detail later, which was overruled by the court. The trial of the case commenced on June 21, 1971, and at the end of the presentation of the State's case in chief the cause was continued until the next morning and the jury separated. The next morning Appellant filed a motion for mistrial because of a newspaper article that appeared in The South Bend Tribune, which motion was overruled by the trial court and is assigned as error here.
The jury returned a verdict of guilty. On July 7, 1971, Appellant filed his petition to adjudicate the defendant as a criminal sexual deviant, which petition was denied.
Thereafter, the court sentenced the Appellant to the Indiana State Reformatory for a period of not less than ten nor more than twenty years.
The Appellant presents and argues three essential issues in this case: (1) Whether the trial court erred in treating the criminal sexual psychopath statute, which had been repealed, as inapplicable to this case. (2) Whether the trial court erred in denying a motion to suppress evidence of identification. (3) Whether the trial court erred in denying a mistrial requested because of the newspaper article about the trial.
The criminal sexual deviancy act is Acts 1971, P.L. 452, I.C. 1971, 35-11-3.1-1 et seq., which is found in Ind. Ann. Stat. § 9-4001 (Burns' 1971 Cum. Pocket Supplements). This act contained an emergency clause and was approved on April 8, 1971. It also contained a specific repeal of the criminal sexual psychopath act which was Acts 1949, ch. 124, §§ 1-4, and Acts 1959, ch. 356, § 1, I.C. 1971, XX-XX-X-X through XX-XX-X-X, as found in Ind. Ann. Stat. §§ 9-3401-3404 (Burns' 1956 Repl.). Under the criminal sexual psychopath act our Supreme Court has stated that the trial judge was given the broadest discretion in such cases which will be reversed only when the sole possible explanation of the conduct is an abuse of discretion. See State ex rel. Savery v. Marion Criminal Court, 234 Ind. 632, 130 N.E.2d 128 (1955), Wolfe v. State, 247 Ind. 540, 219 N.E.2d 807 (1966). In the Savery decision our Supreme Court specifically stated that the interposing of a plea of not guilty by reason of insanity is itself a ground for denying a petition for relief under the criminal sexual psychopath act.
The Criminal Sexual Deviancy Act contains the provision:
"A petition may be made that a person be examined as a possible criminal *857 sexual deviant after he has been convicted of and prior to sentencing for a sexual offense not excluded by the scope of this chapter."
The crime of first degree burglary is not a sexual offense within the meaning of the criminal sexual deviancy act.
Our position here is confirmed by the opinion of our Supreme Court in State ex rel. Stiles v. Hendricks Cir. Ct., Ind., 281 N.E.2d 89 (decided April 12, 1972).
The Appellant was not entitled to relief as a matter of law under either the criminal sexual psychopathic act or the criminal sexual deviancy act.
The offense in this case is alleged to have occurred at a residence in South Bend, Indiana, at approximately 4:30 o'clock A.M. when the occupant of the residence went to the living room of her home to turn off a lamp that had been left burning during the night. At that moment she discovered a man standing in the doorway of the kitchen. The man had apparently gained admission by slashing the screen on the rear door. The witness made a positive identification of the man as being the Appellant. At the time she first saw him in the kitchen doorway he was only three feet away from her and facing her. The light from the lamp was shining directly in his face. She then noticed that there was something wrong with his eyelid. The man demanded money from her and she tried to flee but he caught her in her bedroom. He forced her to hand over money in the amount of $20.00 and struck her several times and threatened her. Sometime later this witness was shown a photograph by the police and stated that a picture of the Appellant bore a strong resemblance to the man she saw in her house on the morning of July 3, 1970. On the 12th of July, 1970, the Appellant was led into a certain room with two other males in a Paw Paw, Michigan, jail for the purpose of lineup identification by this witness. The Appellant did not have the presence of counsel nor was he notified that he was participating in a lineup. The witness made an identification of the Appellant while viewing the Appellant through the window for about five minutes.
In the briefs and in oral argument the Attorney General has admitted that the lineup in this case was not made under the procedures required by United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). However, the Attorney General argues that the identification in this case has an independent source apart from the illegal lineup. In Gilbert, the Supreme Court of the United States divided identification into two groups. The first group of witnesses testified on direct examination only that the defendant was the man that robbed them, without mention of any lineup. The lineup was brought out on cross-examination, as it was in this case. In Gilbert the second group testified on direct examination that they had viewed the lineup and there identified the defendant as the robber. The illegal lineup was thus used by the State as corroborative evidence of the in-court identification. The Supreme Court in Gilbert ruled that as to the second group, who had testified on direct examination of the lineup, evidence of an independent origin could not salvage the conviction. As to the group that, on direct examination, made only an in-court identification without referring to prior identification, the Supreme Court stated:
"The admission of the in-court identifications without first determining that they were not tainted by the illegal lineup but were of independent origin was constitutional error. United States v. Wade, supra. We there held that a post-indictment pretrial lineup at which the accused is exhibited to identifying witnesses is a critical stage of the criminal prosecution; that police conduct of such a lineup without notice to and in the absence of his counsel denies the accused his Sixth Amendment right to counsel and calls in question the admissibility at trial *858 of the in-court identifications of the accused by witnesses who attended the lineup. However, as in Wade, the record does not permit an informed judgment whether the in-court identifications at the two stages of the trial had an independent source. Gilbert is therefore entitled only to a vacation of his conviction pending the holding of such proceedings as the California Supreme Court may deem appropriate to afford the State the opportunity to establish that the in-court identifications had an independent source, or that their introduction in evidence was in any event harmless error." 388 U.S. at 272, 87 S.Ct. at 1956 (Emphasis added).
In this case the evidence from an independent source includes the opportunity that the witness had at the time of the offense to examine the burglar's features. When she first saw him in her house that night, he was standing only about three feet away from her, facing her, with a light shining in his face. She was able to see that there was a scar or some other noticeable feature on his eyelid. She also noted the color of pants he was wearing and was able to describe, in detail, his hat. They were also in close proximity for sometime in the bedroom which was partially lighted. In Fulks v. State, Ind., 262 N.E.2d 651 (1970), Justice Givan, speaking for a majority of our Supreme Court, stated:
"Appellant also claims that the preliminary hearing in the City Court was for all intents and purposes an unlawful lineup.
The United States Supreme Court has held in the cases of United States v. Wade (1967), 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California (1967), 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, that evidence of identification obtained at a pre-trial lineup is not admissible, if the accused is not represented by counsel or if the lineup is unfair in that it tends to call attention to the accused in an undue manner. However, the cases written by the Supreme Court of the United States on this subject do not require a reversal of the case, if it is clearly demonstrated that notwithstanding irregularities in pre-trial lineup there is positive in-court identification of the accused, which identification in no way depends upon observations made of the accused during the improper lineup.
The court in Gilbert, discussing Wade, stated:
`* * * a post-indictment pretrial lineup at which accused is exhibited to identifying witnesses is a critical state of the criminal prosecution; that police conduct of such a lineup without notice to and in the the absence of his counsel denies the accused his Sixth Amendment right to counsel and calls in question the admissibility at trial of the in-court identifications of the accused by witnesses who attended the lineup. However, as in Wade, the record does not permit an informed judgment whether the in-court identifications at the two stages of the trial had an independent source. Gilbert is therefore entitled only to a vacation of his conviction pending the holding of such proceedings as the California Supreme Court may deem appropriate to afford the State the opportunity to establish that the in-court identifications had an independent source, or that their introduction in evidence was in any event harmless error.' 87 S.Ct. at 1956, 18 L.Ed.2d 1186.
In the Wade case the court stated:
`* * * We do not think this disposition can be justified without first giving the Government the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification. (Citing case.) Where, as here, the admissibility of evidence of *859 the lineup identification itself is not involved a per se rule of exclusion of courtroom identification would be unjustified.' (Citing cases.) 87 S.Ct. at 1939, 18 L.Ed.2d 1164, 1165.
In the case at bar a hearing was had out of the presence of the jury which clearly established that Kennon was the only one of the three identifying witnesses who was in attendance at the preliminary hearing. Kennon was not coached or prompted by anyone. Appellant entered the court room with several others and was immediately recognized by Kennon. Kennon immediately left the court. He could not have been influenced by the court proceedings because he left before they began.
Kennon's in-court identification was based upon his observation of the appellant at the time of the robbery. It is further brought out that the other two identifying witnesses did not attend the pre-trial hearing, did not discuss the pre-trial hearing with Kennon and had no other comparison by which to identify the appellant in court other than their personal observations of him during the robbery. We, therefore, hold that the requirements set forth in Wade-Gilbert were fully covered by the trial court. There was no error in allowing Kennon to testify concerning the identification of the appellant. Certainly the other identifying witnesses had no connection whatsoever with the pre-trial identification of the appellant thus the admissibility of their testimony is not questioned under the Wade-Gilbert rule."
More recently our Supreme Court was confronted with a similar question in Martin v. State, Ind., 279 N.E.2d 189 (1972), wherein Justice Hunter speaking for the majority laid down the following guidelines:
"It is apparent in this case that appellant was denied his right to counsel guaranteed by the Sixth and Fourteenth Amendments of the Constitution of the United States and Article 1, Section 13 of the Constitution of Indiana as the lineup took place after his arrest for this offense. However, where admissibility of evidence as to the lineup itself is not involved, a per se exclusionary rule is not justified. Such is the case in this instance. The State asked no questions of the witness concerning the lineup on direct examination and no mention was made of the lineup until cross-examination of the witness by defense counsel. United States v. Wade, supra, holds that the government is required to establish by clear and convincing evidence that the in-court identifications of the defendant were based upon identifications other than that at the lineup. Several factors were mentioned upon which to base this determination. They are as follows:
(1) Prior opportunity to observe the alleged criminal act;
(2) Existence of any discrepancy between any prelineup description and the defendant's actual description;
(3) Any identification of another person prior to the lineup;
(4) Identification of defendant by picture prior to lineup;
(5) Failure to identify the defendant on a prior occasion;
(6) Lapse of time between the alleged act and the lineup description;
(7) Those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup. See United States v. Wade, supra, 388 U.S. at 241, 87 S.Ct. 1926, 18 L.Ed.2d 1149."
Tested by the above standards there is clear and convincing evidence in the record in this case to establish each of the stated criteria. In fact a much stronger case is presented here on each point than in Martin.
On the basis of the record in this case we find that in-court identification of *860 the Appellant by the prosecuting witness had a sufficient independent origin from the alleged prejudicial pretrial confrontation.
It would also appear that the evidence of identification from an independent source is well within the rules laid down by Judge Jackson in Douglas v. State, Ind., 261 N.E.2d 567 (1970).
On the evening of June 21, 1971, an article appeared in The South Bend Tribune which is a newspaper widely circulated in and around St. Joseph County, Indiana, in which it is stated:
"Burglary, Rape Trial Opens
Initial testimony in the trial of Raymond Lindsey, 22, accused of first degree burglary in a home break-in last July 3 in which a woman was also raped, was expected to begin this afternoon in Superior Court.
Prosecution and defense attorneys were still attempting to select a jury shortly before noon today.
Prior to the opening of the trial, Judge E. Spencer Walton overruled a defense motion that would have suppressed an indentification [sic] of Lindsey by the victim during a police lineup last year.
Identifies Suspect
According to testimony from the victim, a 45-year-old South Bend woman, and from policemen working on the case, the victim was taken to Paw Paw, Michigan, on July 12, 1970, where she identified Lindsey as the man who broke into her house.
Lindsey was committed to the Norman Beatty Memorial Hospital, Westville, in 1967, in connection with an attack on a South Bend housewife. Hospital officials authorized him to leave the hospital in May, 1970, to attend a friend's wedding in South Bend. He never returned to the hospital, and was subsequently accused in the July 3 burglary.
Lindsey was being held in the Paw Paw jail on July 12 because he had been arrested that day by Michigan State Police, who charged him with carrying a concealed weapon after they found a handgun in a car in which Lindsey and two others were riding.
The defense had claimed that the woman's identification of Lindsey was improper because two other persons in the viewing room with Lindsey were `grossly dissimilar' in appearance to the defendant.
Police detective division chief Jerome Perkins, and detective Capt. Frank Arenault, who accompanied the victim to Paw Paw, said the woman's identification of Lindsey was `immediate,' and that she had previously identified him from police mug files.
$25,000 Bond
Judge Walton ruled that it was permissible for police to allow the victim to corroborate her identification of Lindsey's photograph by viewing him in person, and said the identification would have been proper even if Lindsey had been alone in the room.
Lindsey is being held in the county jaul [sic] under $25,000 bond."
The Appellant filed a motion for a mistrial due to the prejudicial atmosphere created by the News Media the morning after the article was published, which motion was denied. The general rule in Indiana is that the granting of a mistrial rests largely in the sound discretion of the trial judge. Bonds v. State, Ind., 280 N.E.2d 313 (decided March 30, 1972); Greenwalt v. State, 246 Ind. 608, 209 N.E.2d 254 (1965), and Duke v. State, 49 Ind. 466, 233 N.E.2d 159 (1968). Thereafter the trial court conducted an extensive in-court voir dire of each juror in order to determine whether any of the jurors were exposed to the article in question. Those jurors that had read the article, stated, under oath, that they were not influenced by the article.
*861 The Appellant thereafter attempted to file numerous affidavits of jurors on this subject.
In Wilson v. State, 253 Ind. 585, 255 N.E.2d 817, 821 (1970), it was stated:
"A jury's verdict may not be impeached by testimony of the jurors. Even the slightest consideration of such a practice under the circumstances would create an intolerable situation and no jury verdict would ever be lasting or conclusive."
The specific practice of attempting to impeach a jury's verdict by the use of affidavits was specifically rejected in Jessop v. Werner Transportation Co., Ind. App., 261 N.E.2d 598 (1970); Nowling v. Akers, Ind. App., 274 N.E.2d 546 (1971), and Leuck v. Goetz, Ind. App., 280 N.E.2d 847 (decided April 3, 1972).
In view of the specific holdings of this court and our Supreme Court on the practice of soliciting and securing jurors' affidavits to undermine a jury verdict it should now be clear that such practice is entirely inconsistent with the sanctity of jury deliberations, past and present. To even imply that such a practice is permissible is an open invitation to harassment of jurors by unsuccessful counsel after every jury trial. We are not prepared to be a party to such an invitation. It is all too easy for ingenious counsel to prepare carefully worded affidavits to cast doubt on a jury verdict. Such a practice undermines the right to trial by jury.
The Appellant's basic contention is that the article injected rape into the case when there was no evidence in the trial from which the same might be inferred. On direct examination the prosecuting witness testified as follows:
"Q. What happened then, if anything?
A. Do I have to tell that part?
Q. Just tell what happened, if anything?
A. He made me go to bed."
At a later time the same witness gave the following testimony:
"Q. What happened then after you gave this man the money?
A. I don't want to talk about it."
In Harris v. State, 249 Ind. 681, 231 N.E.2d 800 (1967), Justice Hunter speaking for our Supreme Court, stated:
"The rule requires much more than a mere speculation that an article was read by a juror and of course the law also requires more than a mere speculation that a juror had read the article and was prejudiced thereby. We agree with the appellee's position that if the appellant's contention were adhered to it would be impossible to convict any criminal whose trial was reported in the newspaper.

Even if appellant had shown that some member of the jury read the article, it is clear that the reading of a newspaper article pertaining to the case by a juror is not grounds for mistrial, new trial or reversal unless it is shown that the jurors were influenced thereby. United States v. Mitchell, 319 F.2d 402, (7 Cir.1963); United States v. Carruthers, 152 F.2d 512, (7 Cir.1946), cert. denied 327 U.S. 787, 66 S.Ct. 805, 90 L.Ed. 1014. See also 31 A.L.R. 417." (our emphasis.)
We do not here have the kind of intensive and pervasive publicity which was involved in Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and Baniszewski v. State, Ind., 261 N.E.2d 359 (1970).
In Napier v. State, Ind., 266 N.E.2d 199 (1971), Justice Givan, speaking for our Supreme Court, stated:
"We hold that the case at bar does not come within the purview of Marshall v. United States (1959), 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250. In the *862 Marshall case evidence which had been excluded by the trial court as being inadmissible was published in the newspaper and read by the jurors. In the case at bar the evidence which the newspaper claimed to be forthcoming was never submitted by the State. There was no claim in the newspaper article that it was evidence which the trial court had excluded. It was merely a promise of things to come which did not materialize. The appellant does not show this Court nor do we find from the record how this situation could have prejudiced the appellant. In the absence of a showing of prejudice the trial court will be affirmed. Harris v. State (1967), 249 Ind. 681, 231 N.E.2d 800, 12 Ind.Dec. 279."
The Supreme Court of the United States or our own Supreme Court have never held that jurors must be absolutely insulated from all expressions of opinion on the merits of a case or the judicial process at the risk of requiring a new trial. See Irvin v. Dowd, supra.
We are not here concerned with the conduct of acts by counsel, either for the State or Defendant, which bring about the publication of extra judicial information regarding a pending trial. The entire thrust of the American Bar Association's Minimum Standards for Criminal Justice relates to conduct by counsel. In this case there is not the slightest suggestion that the publication of any information was procured by the Prosecuting Attorney of St. Joseph County. The same is true of the law enforcement agencies involved in the investigation of this case.
These two courts have refused to hold that jury contact with outside information is always a cause for overthrowing a verdict and have wisely held that each such case must "turn on its special facts". Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250.
Marshall, Estes, Sheppard and Irvin all require a substantial showing of prejudice in fact to be made before a due process violation can be found. It is unrealistic and impossible to expect or require that a jury be a laboratory completely sterilized and freed from all external factors.
It is within the discretion of the trial court to interrogate or poll the jury to ascertain whether they have read newspaper articles pertaining to the trial. Ford v. United States, 233 F.2d 56 (5th Cir.1956), cert. den. 352 U.S. 833, 77 S.Ct. 49, 1 L.Ed.2d 53 and United States v. Manning, 440 F.2d 1105 (5th Cir.1971), cert. den. 404 U.S. 837, 92 S.Ct. 125, 30 L.Ed.2d 69 (1971).
All references to prior convictions, arrests or other offenses are not per se reversible error if the trial court takes appropriate corrective action. There are a number of examples where our Supreme Court has considered such as harmless error. See Brown v. State, Ind., 281 N.E.2d 801 (decided May 1, 1972), and Moore v. State, Ind., 280 N.E.2d 57 (decided March 21, 1972). See also Duke v. State, 249 Ind. 466, 233 N.E.2d 159 (1968).
We find no abuse of discretion in the procedure followed by the trial court in this case.
In view of the answers of the jurors under oath the trial judge, appropriately and wisely, conducted an extensive voir dire examination of the jury in-court, which examination was under oath. The Judge had the opportunity to observe the demeanor and the conduct of the jury at that time as well as throughout the entire trial. Given the premises set forth in the Estes, Sheppard and Napier cases we cannot here say as a matter of law that this one article in The South Bend Tribune should be the basis for reversing this case. As Justice Hunter appropriately pointed out in Harris v. State even if some member of the jury has read an article pertaining to a trial, it is clear that the reading of a newspaper article pertaining to the case by a juror is not grounds for a mistrial, new *863 trial or reversal unless it is shown that the jurors were influenced thereby. The trial judge in this case chose to believe the statements of the jurors made in open court under oath and determined that the jury was not, in fact, influenced. We will not here disturb his decision in this regard. The entire voir dire examination of the jury is attached hereto as Appendix A.
The Appellant having failed to convince us of the existence of any reversible error the decision of the trial court is hereby affirmed.
HOFFMAN, C.J., concurs.
STATON, J., dissents with opinion.

APPENDIX A
THE COURT: Ladies and Gentlemen of the Jury. An unfortunate thing happened here and I must make an inquiry at this time that I could not make before you returned a verdict. There was a story about this case that appeared in the South Bend Tribune yesterday afternoon and last evening.
Now, I must ask each one of you if you read, saw or read that story. You're assigned by numbers, you're Juror Number One in the front seat and six. Seven is back there and twelve is the last juror over here.
Juror Number One, did you see the story?
H.C. OVERGAARD: I did not.
THE COURT: You did not see it or read it?
H.C. OVERGAARD: No.
THE COURT: Juror Number Two, did you see or read it?
MARTHA SWANSON: Yes, I did.
THE COURT: Did this have something to do with your verdict at all?
MARTHA SWANSON: No.
THE COURT: Juror Number Three, did you see or read the story?
RAYMOND VANDERGRACHT: No, sir, I did not read it.
THE COURT: Juror Number Two, you did read the story?
MARTHA SWANSON: Yes, I did.
THE COURT: You read all of it?
MARTHA SWANSON: I didn't realize that it was the same case from the headline.
THE COURT: Juror Number Four, did you read the story?
ELMER LOVE: I read the headline and that was it.
THE COURT: You didn't read the body of the story?
ELMER LOVE: No.
THE COURT: Juror Number Five, did you read or see the story?
IRENE REED: I did not read or see it.
THE COURT: Juror Number Six, did you see or read the story?
HELEN HEINTZELMAN: No, I did not. I know that there was one. My husband made reference to it and I said that we're not suppose to read it and I didn't even see it.
THE COURT: Juror Number Seven, did you read or see the story?
WILLIAM BECKER: I read the headline.
THE COURT: Anything further?
WILLIAM BECKER: No.
THE COURT: Juror Number Eight, did you see or read the story?
RAYMOND HINTZ: I read the name Raymond Lindsey and I stopped.
THE COURT: You read just the headline and the name?
*864 RAYMOND HINTZ: About three or four words.
THE COURT: Juror Number Nine, did you read or see the story?
MARY FITZGERALD: I did not read the paper.
THE COURT: Juror Number Ten, did you read or see the story?
DOROTHY BAGARUS: I did not read it. I saw the caption of the article and I did not read it.
THE COURT: Juror Number Eleven, did you see or read the story?
RON GRONTKOWSKI: I also saw the headline and my wife told me that it was in the paper.
THE COURT: Juror Number Twelve, did you read or see the story?
MARGARITA FELAN: I saw it and I read it.
THE COURT: You read the whole story?
MARGARITA FELAN: Yes.
THE COURT: Did it have anything to do with your verdict today?
MARGARITA FELAN: No.
THE COURT: Is there any other question that you want me to ask them, Mr. Brennan.
MR. BRENNAN: If your Honor, please. Number Eleven and Number Six have said something to the effect that they have talked to their spouses.
THE COURT: You have a right to inquire.
MR. BRENNAN: Madam, you stated that you talked to your husband about the story?
HELEN HEINTZELMAN: I didn't talk with him. I came in and he said that he had seen it in the paper and he said, I suppose, that you're on this thing and I said we're not suppose to talk about it. He said that I seen it in the paper and I said, we're not suppose to read anything in the paper about it and we're not suppose to talk about it.
MR. BRENNAN: He didn't discuss with you what he read?
HELEN HEINTZELMAN: He did not. He is fair about that. I don't know what was in it.
MR. BRENNAN: And Mr. Grontkowski, what did you and the Mrs. talk about?
RON GRONTKOWSKI: Basically about the same thing. I walked in and she showed the paper to me and I saw the headline and she said, is this the story that you're in Court. I was really joking and said, we're not suppose to read that and I'm not going to tell you what happened today. Basically, that was the extent of our talk about the story in the paper. That was about the extent of it.
MR. BRENNAN: She didn't tell you about the contents of the story?
RON GRONTKOWSKI: No.
MR. BRENNAN: Thank you, very much.
STATON, Judge (dissenting).
The fundamental question before us is whether the defendant had a fair trial. He has an absolute right to a public trial by an impartial jury. This is guaranteed to him by the Sixth Amendment to the Constitution of the United States and Article 1, § 13 in the Constitution of the State of Indiana. This sacred right has been denied. I dissent.
The Defendant was not charged with rape. He was charged with first degree burglary. The testimony during the trial suggested that a rape had occurred. The newspaper article confirms it. The article reveals:
1) That the Defendant has a criminal record;

*865 2) That the Defendant is a criminal sexual pyschopath who has been committed to Norman Beatty Memorial Hospital at Westville;
3) That the Defendant has been convicted before of attacking a woman in much the same manner that he did in the present case by making her "go to bed" with him;
4) That he raped the prosecuting witness;
5) That the prosecuting witness identified the Defendant "immediately" at Paw Paw, Michigan;
6) That the Defendant was under arrest for carrying a concealed weapon in Paw, Paw, Michigan when he was identified by the prosecuting witness; and
7) That the prosecuting witness had identified him from police mug files previously according to police detective division chief Jerome Perkins and detective Captain Frank Arsenault. (The record shows that the prosecuting witness, Edith Mae Dunn, could not positively identify the Defendant from the mug files or pictures shown to her by the police.)[1]
*866 After two jurors had read this article in its entirety and another five jurors had been made aware of its contents in varying degrees, it is ludicrous to contend that these same jurors will return to the courtroom the next morning and see the Defendant in the same light as the day before. The emotional impact of the article upon the jurors is incalculable. In the present case, the prosecuting witness testified, "He made me go to bed." She then asks, "Do I have to tell that part?" When the prosecuting witness was asked what happened after she gave him the money, she replied, "I don't want to talk about it." Even the most naive juror could see the connection between the criminal record of the Defendant revealed in the newspaper article and the reluctance on the part of the witness to testify about what happened in the bedroom. In whatever light the Defendant had been cast before the jury on the first day of trial, it is abundantly clear that it was not the same light on the second day of trial. The lurking shadows of infamy and degradation now stood beside him. The jury's mind had been contaminated with "newspaper testimony" of his character and guilt. A fair trial was impossible.
Other compelling reasons for my dissent are:

1. Reason One: Estes and Sheppard Cases do not apply; Napier Case can be distinguished.
I cannot accept the conclusion of my brothers that "given the premises set forth in the Estes, Sheppard and Napier cases we cannot here say as a matter of law that this one article in The South Bend Tribune should be the basis for reversing this case."
The only common denominator in Estes, Sheppard and Napier is the permeation of the news media into the judicial process. Estes and Sheppard are not applicable to the present case. In Estes v. State of Texas (1965), 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, the prejudice emanated from the televising of his notorious, heavily publicized and highly sensationalized criminal trial. Given the kind of media employed, the volume of newspaper reports, generated public interest and the resulting *867 sensationalism, the premise was that such reporting had a culminating prejudicial nature and character. This gave rise to the presumption that due process under the Fourteenth Amendment was not possible. In Sheppard v. Maxwell (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, we have essentially the same reasoning with very slight variation. Here the court stated 86 S.Ct. at 1518:
"While we cannot say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone, the court's later rulings must be considered against the setting in which the trial was held. In light of this background, we believe that the arrangements made by the judge with the news media caused Sheppard to be deprived of that `judicial serenity and calm to which [he] was entitled.'"
Napier v. State (1971), Ind., 266 N.E.2d 199, cannot be lumped together with Sheppard and Estes as having the same common premise nor are their separate premises equally applicable to the case at bar. In Napier, supra, there was a single newspaper article which promised witnesses and testimony that did not materialize during the trial. An article appeared in The Noblesville Ledger on the evening of the first day of trial which stated:
"On Monday Judge Edward F. New, Jr. held that three `newly discovered witnesses' in the case may remain unidentified until the trial. The prosecution maintains the three have feared the consequences of testifying. The three were involved in a conversation with Napier in which he stated he was the driver of the car which Stidham was killed. * * *" (Emphasis added) 266 N.E.2d at 206.
Napier, supra, is easily distinguished from the case at bar. First the nature of the article is merely a promise of evidence as to the guilt of the Defendant which was never produced by the State at trial. Secondly, the trial judge "... [D]id everything reasonably within his power to remind the jury of his preliminary instruction that they should disregard anything heard on the radio or television or anything read in the newspapers concerning the case, and that they should make their decision based solely upon the evidence received in court." Napier, supra, 266 N.E.2d at 204. This protective action was taken by the trial court immediately upon learning of the newspaper article. Even in Napier, supra, the Supreme Court in its opinion written by Justice Givan stated:
"This in and of itself might not be sufficient in some instances, but in the case at bar the objectionable part of the article was that three witnesses would testify at the appellant's trial to the effect that the appellant had told them that he was driving the automobile. Although witnesses did appear and testify against the appellant following the publishing of the article, no witnesses testified as to any such statement by the appellant. The jurors were expressly told by the judge that the statement contained in the article was absolutely false." 266 N.E.2d at 204.
Reducing the distinction of basic premises between Sheppard and Estes, supra, on the one hand, and Napier, supra, on the other to the simplest terms, we have a created atmosphere within the judicial process in Sheppard and Estes versus a single penetration of prejudicial information into the judicial process in Napier, supra. Sheppard and Estes are premised on a multiplicity of news media which are so intense and all encompassing that an atmosphere is created which actually penetrates the defendant's trial and denies to him a fair trial. This prejudice is presumed without having to inquire of the jurors. On the other hand, Napier, supra, is based not upon a created atmosphere within the courtroom but upon the actual reading of a single newspaper article whose actual prejudicial character and nature must be determined by the trial judge after making an inquiry of the jurors and after taking necessary protective procedures that may be required. Although my brothers in their majority *868 opinion do recognize that "... [W]e do not here have the kind of intensive and pervasive publicity which was involved in Estes v. Texas," I feel that the basic difference does not lie solely upon the "... intensive and pervasive publicity... ." The basic premises are much different. Estes and Sheppard, supra, are based upon an assumed premise of prejudicial atmosphere or depriving the defendant of that "... judicial serenity and calm to which [he] was entitled." A new trial is ordered upon concluding that the atmosphere has permeated the defendant's trial.
Napier, supra, is based upon a single newspaper article which may have been read by one or more jurors. The premise in Napier, supra, is not assumed but determined to exist by the trial court after inquiry made to the jury panel and after taking those protective measures deemed necessary by the jurors' answers to the inquiries which may include declaring a mistrial.

2. Reason Two: It is Mandatory for the Trial Court to Interrogate the Jury after Prejudicial Publicity has been brought to the Court's Attention.
I do not agree with the majority that: "It is within the discretion of the trial court to interrogate or poll the jury to ascertain whether they read newspaper articles pertaining to the trial." My brothers in the majority have cited the following Fifth District cases: Ford v. United States, 233 F.2d 56 (5th Cir.1956), cert. den. 352 U.S. 833, 77 S.Ct. 49, 1 L.Ed.2d 53 (1956), and United States v. Manning, 440 F.2d 1105 (5th Cir.1971), cert. den. 404 U.S. 837, 92 S.Ct. 125, 30 L.Ed.2d 69 (1971).
In Margoles v. United States, 407 F.2d 727 (7th Cir.1969),[2] the Court held:
"Thus, the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further." 407 F.2d at 735.
This decision holds that it is mandatory for the trial court to interrogate the jury after prejudicial publicity has been brought to the court's attention.
In the present case, the trial judge did nothing until after the verdict of the jury. At the beginning of the second day of trial in the morning, the trial judge received the Defendant's motion for mistrial due to prejudice created by the news media. The trial judge proceeded on until final verdict without ever addressing the jury or making any effort to preserve a fair trial. The record shows the following interchange between the trial court, Defendant's attorney and the prosecutor while arriving at this decision:
"THE COURT: And now the defendant files motion for mistrial due to the prejudice created by the news media. I think that we all noticed the story in the paper and which was not based on the evidence in this case. I don't know what it is based upon. I consider it highly improper for the Tribune to publish such a story at this place in the trial. We have two things which we can do here. One is to grant your motion and the other is to complete the trial and on the motion of the created errors if it had any effect on the jury. There is no question but what if it has any effect on this jury that he is entitled to a mistrial.
"MR. BRENNAN: There aren't any of us that want to try this case over.

*869 "THE COURT: I know exactly what you mean. This is a waste of the taxpayers time and money and everything else. I don't know what you want to do Mr. Prosecutor. What do you want to do on it.
"MR. WHITMAN: Is there any chance that they can be voir dired. The question is whether they read the paper.
"THE COURT: So what, if any didn't read it they could run home tonight and find out what we're talking about.
"MR. WHITMAN: It will probably go to the jury by tonight and I figure that there are chances that they haven't seen it.
"THE COURT: We can voir dire the jury after the verdict in case they want the jury voir dired."
In United States v. Palermo, 410 F.2d 468, 471, (7th Cir.1969), the Court citing United States v. Accardo, 298 F.2d 133 (7th Cir.1962) and Margoles v. United States, 407 F.2d 727 (7th Cir.1969), stated while reaffirming these cases that they:
"... [H]old that at a minimum, the trial judge must question the jury as a whole when prejudicial publicity is brought to his attention. See also United States v. Rizzo, 409 F.2d 400 (7th Cir.1969). Warning the jury without questioning them is insufficient."
The trial judge in the present case did neither upon learning of the prejudicial publicity. The voir dire after the verdict was meager and meaningless.

3. Reason Three: There is a Difference Between "Harpoons" and "Torpedoes"! The Majority's Assumption that "All References to Prior, Convictions, Arrests or Other Offenses are not Per Se Reversible Error if the Trial Court Takes Appropriate Corrective Action" is not Supported by Authority Cited and does not Apply in the Present Case where no Corrective Action was taken.
I cannot reconcile this assumption with the authorities cited: "All references to prior convictions, arrests or other offenses are not per se reversible error if the trial court takes appropriate corrective action. There are a number of examples where our Supreme Court has considered such as harmless error. See Brown v. State, Ind., 281 N.E.2d 801 (decided May 1, 1972), and Moore v. State, Ind., 280 N.E.2d 57 (decided March 21, 1972). See also Duke v. State, 249 Ind. 466, 233 N.E.2d 159 (1968)."
All of these cases are predicated upon the testimony of police officers given on the witness stand in court. In Brown v. State (1972) Ind., 281 N.E.2d 801, (decided May 1, 1972), Officer Racine was asked by counsel:
"Q. Do you recall any other conversation?
"A. No, it was a short time prior to that when we discovered that he had been an escapee at that time from Pendleton, I believe, and we asked him about this, and he said that he had ..."
In Brown v. State, supra, the trial court admonished the jury that the remark by the Officer was improper and that they would disregard it in their deliberations.
In Moore v. State (1972) Ind., 280 N.E.2d 57, 58, Indianapolis Police Officer Sgt. Lund was asked:
"Q. About where he was born and where he was reared, and how long he'd been here in Indianapolis?
"A. Yes. I also asked him if he'd done any time on any matters other than traffic violations, which didn't count, and he said he done five years for Assault and Robbery."
In Duke v. State (1968), 249 Ind. 466, 233 N.E.2d 159, the defense counsel asked Police Officer Owen:
"Q. When I ask a question, answer it.
*870 "A. In the automobile he was in we found heroin." In the latter case, the judge ordered that the answer be stricken from the record and the jury was admonished to disregard the statement.
In each of the above cases, Brown v. State, Moore v. State and Duke v. State, supra, the statements were made by Police Officers on the witness stand in court. No newspaper article was involved. No corrective action was taken by the trial court in the present case. The aforementioned cases are often characterized as "harpoon" cases. A newspaper article could very well be characterized as a "torpedo" since neither counsel or the trial judge know if the "torpedo" will hit its mark until the jury is interrogated. The trial judge must ascertain whether the damage has been severe enough to abandon the trial by declaring a mistrial or continue on with the trial after making repairs. This must be done immediately upon learning of the "launching of the torpedo." No immediate action was taken after learning of the "launching of the torpedo" in the present case. Therefore, the authorities cited by the majority do not support their proposition of law. "Harpoons" and "torpedos" are different.

4. Reason Four: Harris v. State Does Not Support the Majority's Position.
Harris v. State (1968), 249 Ind. 681, 694, 231 N.E.2d 800, 807, does not support the majority's position. In Harris, supra, the jury was asked by the court: "Has any member of the jury read the article concerning the trial in this morning's Courier Journal?" No response came forth from the jury. The jury was silent. It was never established by the appellant in the Harris case, supra, that the article had been read by the jury. The contention of the appellant was: "... that the mere publication of the article is grounds for reversal." Judge Hunter, writing the majority opinion in Harris, supra, 249 Ind. at 694, 231 N.E.2d at 807, concluded: "The rule requires much more than a mere speculation that an article was read by a juror and of course the law also requires more than a mere speculation that a juror had read the article and was prejudiced thereby." In the present case, two jurors admitted having read the entire article and five others were aware of it in varying degrees.

5. Reason Five: The Facts In The Present Case Come Squarely Within Marshall v. United States.
The present case comes squarely within Marshall v. United States (1959), 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250. Marshall, supra, stands for the proposition that publicity may be of such a nature and character that a juror exposed to it will be presumed prejudiced regardless of his insistence that he can remain impartial. In Marshall, supra, the defendant was convicted of unlawfully dispensing a number of dextroamphetamine sulfate tablets without a prescription from a licensed physician. The newspaper articles referred to two previous felony convictions: serving a forgery sentence in the State Penitentiary at McAlester, Oklahoma and serving sixty days in jail on a drug charge with his wife. The charge of dispensing a drug without a prescription from a licensed physician is just as dissimilar from forgery as rape is to burglary in the present case.
I can find no conflict between Napier, supra, Harris, supra, Marshall, supra, United States v. Palermo, supra, and Margoles v. United States, supra. The trial court committed reversible error when it failed to take immediate action upon being notified of the newspaper article. The trial court should have declared a mistrial. This cause should be reversed with instruction to grant a new trial.
NOTES
[1] I do not agree with the majority that there was not the slightest suggestion that any of the information was procured from law enforcement agencies. The newspaper article quotes Police Detective Division Chief Jerome Perkins and Detective Capt. Frank Arsenault. The MINIMUM STANDARDS FOR CRIMINAL JUSTICE which have been adopted by the American Bar Association provide:

"It is recommended that law enforcement agencies in each jurisdiction adopt the following internal regulations:
(a) A regulation governing the release of information, relating to the commission of crimes and to their investigation, prior to the making of an arrest, issuance of an arrest warrant, or the filing of formal charges. This regulation should establish appropriate procedures for the release of information. It should further provide that, when a crime is believed to have been committed, pertinent facts relating to the crime itself and to investigative procedures may properly be made available but the identity of a suspect prior to arrest and the results of investigative procedures shall not be disclosed except to the extent necessary to aid in the investigation, to assist in the apprehension of the suspect, or to warn the public of any dangers.
(b) A regulation prohibiting (i) the deliberate posing of a person in custody for photographing or televising by representatives of the news media and (ii) the interviewing by representatives of the news media of a person in custody unless, in writing, he requests or consents to an interview after being adequately informed of his right to consult with counsel and of his right to refuse to grant an interview.
(c) A regulation providing:
From the time of arrest, issuance of an arrest warrant, or the filing of any complaint, information, or indictment in any criminal matter, until the completion of trial or disposition without trial, no law enforcement officer within this agency shall release or authorize the release of any extrajudicial statement, for dissemination by any means of public communication, relating to that matter and concerning:
(1) The prior criminal record (including arrests, indictments, or other charges of crime), or the character or reputation of the accused, except that the officer may make a factual statement of the accused's name, age, residence, occupation, and family status, and if the accused has not been apprehended, may release any information necessary to aid in his apprehension or to warn the public of any dangers he may present;
(2) The existence or contents of any confession, admission, or statement given by the accused, or the refusal or failure of the accused to make any statement, except that the officer may announce without further comment that the accused denies the charges made against him;
(3) The performance of any examinations or tests or the accused's refusal or failure to submit to an examination or test;
(4) The identity, testimony, or credibility of prospective witnesses, except that the officer may announce the identity of the victim if the announcement is not otherwise prohibited by law;
(5) The possibility of a plea of guilty to the offense charged or a lesser offense;
(6) Any opinion as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case. It shall be appropriate during this period for a law enforcement officer:
(1) to announce the fact and circumstances of arrest, including the time and place of arrest, resistance, pursuit, and use of weapons;
(2) to announce the identity of the investigating and arresting officer or agency and the length of the investigation;
(3) to make an announcement, at the time of seizure of any physical evidence other than a confession, admission, or statement, which is limited to a description of the evidence seized;
(4) to disclose the nature, substance, or text of the charge, including a brief description of the offense charged;
(5) to quote from or refer without comment to public records of the court in the case;
(6) to announce the scheduling or result of any stage in the judicial process;
(7) to request assistance in obtaining evidence.
Nothing in this rule precludes any law enforcement officer from replying to charges of misconduct that are publicly made against him, precludes any law enforcement officer from participating in any legislative, administrative, or investigative hearing, or supersedes any more restrictive rule governing the release of information concerning juvenile or other offenders.
(d) A regulation providing for the enforcement of the foregoing by the imposition of appropriate disciplinary sanctions.
"2.2 Rule of court or legislation relating to law enforcement agencies.
"It is recommended that if within a reasonable time a law enforcement agency in any jurisdiction fails to adopt and adhere to the substance of the regulation recommended in section 2.1(c), as it relates to both proper and improper disclosures, the regulation be made effective with respect to that agency by rule of court or by legislative action, with appropriate sanctions for violation."
[2] Indiana is in the 7th Circuit.